THE STATE ex inf. ELLIOTT W. MAJOR, Attorney-General, v. ARKANSAS LUMBER COMPANY et al.

**In Banc, July 2, 1914.**

1. ORIGINAL PROCEEDING: Commissioner to Take Evidence: Arises Ex Necessitate. The practice of designating some attorney to take testimony and make return thereof to the court, in a *quo warranto* and other original proceedings instituted in the Supreme Court, where the permanent writ is dependent upon proof, arises from the necessity of the case, without the

protecting authority of either Constitution or statute, except as to writs of prohibition, and as to them only by a comparatively recent statute (Laws 1895, p. 95, sec. 6).

2. ———: ———: **Findings of Fact and Conclusions of Law.** The Supreme Court is not warranted, either by the Constitution or the statute, to delegate its full judicial power to a commissioner appointed to take testimony in an original proceeding and to make return thereof. He has only the authority conferred by law upon a special commissioner appointed to take depositions. His findings of facts or conclusions of law, though perhaps persuasive, are not binding on the court—not even when the order appointing him specifically directs him to report such findings and conclusions.

3. ———: ———: **Admission and Exclusion of Evidence.** Nor does such commissioner have power to admit or exclude testimony in the same manner and to the same extent as the court might do in a trial before the court. If the testimony is offered and preserved, and proper exceptions are saved, its competency and efficacy will be determined by the court.

4. **QUO WARRANTO: Jury Trial.** Corporations, joined in an information in the nature of a writ of *quo warranto*, brought in the Supreme Court to oust them of their franchises, being a civil action, are not entitled to a trial by jury.

5. ———: ———: **Timely Request.** A request for a jury trial, made by corporations in a *quo warranto*, not of the court, but for the first time of the commissioner appointed by the court to take the evidence, is not timely made; and even if they were legally entitled to a jury, their right thereto was waived by the untimeliness of the request.

6. ———: **Misjoinder: Dismissal as to Certain Respondents.** The fact that the State dismisses the proceeding against certain corporations joined as respondents in an information in the nature of a *quo warranto*, cannot be held to amount to a misjoinder of the remaining respondents.

7. ———: **Sufficient Petition: Distinction.** A distinction is to be drawn between an information in the nature of a *quo warranto* to oust corporations of their franchises for the doing of an unlawful thing, and one for doing a lawful thing in an unlawful way. An information sufficient for the former might, owing to a lack of statement of facts, be wholly insufficient for the latter. [Comparing State ex rel. v. Mo. Pac. Ry. Co., 240 Mo. 1. c. 48, and State ex rel. Standard Oil, 218 Mo. 1. c. 366.]

8. ———: ———: **Answering Over.** An information in the nature of a *quo warranto*, charging a combination in restraint of trade to do an unlawful thing, in the language of the anti-

trust statute, will be held to be sufficient, if respondents file no formal demurrer, and answer over before the appointment of the commissioner to take testimony, or, by consent of court, thereafter.

9. ————: ————: **Demurrer Ore Tenus.** A demurrer *ore tenus* will not reach mere uncertainty or indefiniteness of averment, or the defect of pleading legal conclusions. Such a demurrer is not regarded as of the same judicial dignity and importance as a formal demurrer.

10. ————: **Methods of Proceeding.** Three methods of proceedings are authorized by the Missouri anti-trust statutes: first, by indictment or information as for a felony, if the offender is a natural person; second, by bill in equity to "prevent and restrain," under Sec. 10303, R. S. 1909, which, jurisdiction attaching and proof being made, draws to itself the punishment prescribed by section 10304; and, third, actions at common law by informations in the nature of *quo warranto*, where all defendants are corporations. The statute is penal in its nature, and in that respect is like the United States Statute (the Sherman Act).

11. ————: **Limitations: Quo Warranto.** A proceeding by the State upon an information in the nature of a *quo warranto* to oust corporations from their franchises for a violation of the anti-trust statutes, is, under Sec. 1890, R. S. 1909, aided by section 1914, barred by limitations in three years. Those are specific statutes on the subject, and specifically include the State in such cases.

12. ————: ————: **When Begin to Run.** But such limitation is not to be applied in all cases to the day of making and entering into the illegal conspiracy or combination in restraint of trade, but is properly applied to the date of the last proven overt act pursuant to such combination; and the action, being a civil one, is not barred, unless three years have expired since said last overt act.

13. ————: **Jurisdiction.** The Interstate Commerce Act does not oust the Supreme Court of its power to oust foreign corporations licensed to do business in this State, who have violated its anti-trust statutes.

14. **CONSTITUTIONAL STATUTE: Title: Reversing Number of of Chapter and Article.** The fact that in the title to the amendatory act the number of the chapter and the number of the article of the Revised Statutes sought to be amended, were reversed or swapped about, will not be held to invalidate the amendatory act, if, by regarding the numbers of the chapter and article as surplusage, a sufficient and correct title of the subject-matter and contents remains. Tested by that rule the

State ex inf. v. Arkansas Lumber Co.

Anti-Trust Act of 1907 (Laws 1907, pp. 374, 377), being sections 10310, 10312 and 10304, Revised Statutes 1909, are not unconstitutional.

15. **CONSPIRACY IN RESTRAINT OF TRADE: Limitations.** Proof that corporations conspired together to limit the output of lumber in this State, and to fix and limit its price to consumers and retailers, will justify a decree ousting them from doing business in this State, if the last overt act in a continuation of such conspiracy was committed within three years before the information was filed.

16. ————: ————: *Unperformed Agreement.* Although the original conspiracy itself may be barred by limitations, yet, if the proof establishes that the corporations did conspire with each other to limit the output of lumber in this State (as charged), it is immaterial whether or not the original agreement between them was carried out, except as affording an overt act, or a continuation of the conspiracy, so as to toll the statute.

17. ————: **Output of Lumber: Companies Having No Mills.** And it is also immateral that some of the companies had no mills and actually manufactured no lumber within the State, if they agreed and conspired with domestic manufacturing respondents, who did have mills here, to curtail the output, or any part of the output actually made in this State.

18. ————: **Sufficient Proof.** The facts of this case show a conspiracy between numerous lumber companies was begun six years at least before the institution of the suit (a) to curtail the output by sawmills of yellow pine and (b) to increase the price of the lumber to retailers and consumers, and that they succeeded in securing the cooperation of about eighty per cent of the manufacturers of yellow-pine lumber in the territory embraced within their operations; that the conspiracy contemplated a curtailment of one-third, and within six months reached forty-four per cent, or one billion feet, and that the prices, as a result of said curtailment, at once began to rise, and was increased fifty cents per month for more than six months, all prior to three years before the filing of this *quo warranto* suit, and that thereafter not only were the increased prices and the control of the output maintained by a steadfast, though informal, adherence to the former purposes and plan, but the prices in some cases were increased by one hundred per cent of what they were before the curtailment began; and that result was brought about, in spite of the fact of vastly improved and cheaper methods of manufacture and demands for new uses. *Held,* that the writ of ouster should go.

19. ————: **Conspiracy: Circumstantial Evidence: Limitations.** The conspiracy having been found to exist, its continuation

after the Statute of Limitations began to run may be established by circumstantial evidence—such as glorying in the results accomplished and acquiescence in and adherence to the plans set in motion prior thereto.

20. ————: **Binding Members and Non-Members.** The unlawful agreements of a part, or even a majority, of the members of a voluntary association of corporations not amounting to a copartnership, will not bind those not actually making, or not present and participating in the making, of such agreement, unless, being members, they carry it out by an overt act done in accordance therewith.

21. ————: ————: ————: **Praiseworthy Organization: Declaration of One as Affecting All: Knowledge.** Where some of the acts and purposes of the association of corporations are praiseworthy, the mere becoming a member is not of itself so far a conspiracy, although the association is used to hatch and put into operation an unlawful combination, as to justify an application of the rule that, a conspiracy being shown, the acts and statements of any conspirator, while the conspiracy continues, will bind all. Yet if a member knows of the unlawful conspiracy and of the unlawful acts of the association, and so knowing joins it, such a one becomes tainted with like guilt with him who took part in the conspiracy at its inception.

22. ————: ————: ————: **Without Knowledge: Withdrawal.** A member of an association of corporations, some of whose acts and purposes are praiseworthy, who having taken no part in an unlawful conspiracy to increase prices or curtail products withdraws on obtaining knowledge, or who without knowledge joins after it has been put in operation and thereafter takes no part in it, or who being a member from the outset is not present at the formation of the conspiracy nor thereafter takes any part in it nor knowingly profits by it, is not to be held guilty, nor is he bound by any admissions of a co-member.

*Quo warranto.*

For judgment see Per Curiam opinion, p. 319.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Special Counsel, for relator.

(1) The information specifically charges facts which show, if true, that respondents have violated the antitrust statutes of this State. The information

meets with every technical requirement of informations in the nature of *quo warranto*. State ex inf. v. Railroad, 240 Mo. 35; State ex rel. v. Grimm, 220 Mo. 483; State ex inf. v. Oil Co., 218 Mo. 1. Each of the respondents, before this case was ever referred to a commissioner, filed his separate answer to the information herein. A number of the respondents went so far as to file amended answers to the information herein before the case was referred to a commissioner. The other respondents who did not file amended answers before the case was referred have filed with the commissioner amended answers subject to the approval of the court. Under the practice of our statutes the issues are required to be made up before the cause is referred to a commissioner to take evidence, and that rule should govern as to causes in this court. The commissioner had no authority to sustain a demurrer to the sufficiency of the information after the cause was referred to him to hear the evidence and report thereon as to the law and evidence. Turner v. Butler, 126 Mo. 131; 1 McQuillin's Mo. Prac., sec. 820; 34 Cyc. 819; Perseverance Min. Co. v. Bisiner, 87 Ga. 193; Belmont Min. Co. v. Costigan, 21 Colo. 471. (2) Respondents are not entitled to a trial by jury in a suit of this nature. A trial by jury cannot rightfully be demanded upon an information in the nature of *quo warranto*. State ex rel. v. Lupton, 64 Mo. 415; State ex rel. v. Vail, 53 Mo. 497; High on Extra. Leg. Rem. (3 Ed.), sec. 613. Respondents, by standing by and permitting the court to refer the cause without objecting to the action of the court in so doing, thereby waived any right to a trial by jury, if they were entitled to such in the first instance. Callahan v. Shotwell, 60 Mo. 398. (3) This suit is not barred by either of the Statutes of Limitation as set up by the respondents. R. S. 1909, secs. 1890, 1914; State ex rel. v. Westport, 116 Mo. 595; State ex rel. v. Huff, 105 Mo. App. 364; State ex rel. v. Vandalia, 119 Mo. App. 424; Common-

wealth v. Birchett, 2 Va. Cas. 51; State ex rel. v. Turnpike Co., 8 R. I. 521. (4) The issuance of the price list, price current and market report, under these several titles, by the Yellow Pine Manufacturers' Association and by the individual members of said association, up to the date of filing this suit, was in direct violation of our anti-trust statutes. R. S. 1909, secs. 10298, 10301, 10302-4; Bank v. Donnell, 172 Mo. 402; State ex rel. v. Tobacco Co., 177 Mo. 3; State ex rel. v. Oil Co., 194 Mo. 164; Standard Oil Case, 218 Mo. 1; State ex inf. v. Harvester Co., 237 Mo. 405; Oil Co. v. Texas, 212 U. S. 108; Coal Co. v. People, 214 Ill. 421; State ex rel. v. Stock Exchange, 211 Mo. 193; State ex inf. v. F. F. Ins. Co., 152 Mo. 40; State ex rel. v. Packing Co, 173 Mo. 356; People v. Sheldon, 139 N. Y. 261. (5) Turning our attention to the curtailment phase of this cause, we find that section 10299, prohibits "pools, trusts, agreements, contract, combination, confederation or understanding, to fix or limit the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever of any class or kind bought and sold." Such was the common law. The commissioner found that respondents, as members of the Yellow Pine Manufacturers' Association, had violated this statute by curtailing the output of yellow pine lumber, and the evidence justifies his finding. Lumber Co. v. Mississippi, 217 U. S. 439: Lumber Dealers v. State, 95 Miss. 342.

*Johnson & Lucas, Holmes, Holmes & Page, W. R. Thurmond, Scarritt, Scarritt, Jones & Miller, Botsford, Deatherage & Creason, J. S. Kirkpatrick, Arthur N. Sager* and *Walter H. Saunders* for respondents.

(1) The information in this case is insufficient in law in that (a) It does not state facts sufficient to con-

stitute a cause of action against the respondents, or any of them; (b) There is a misjoinder of pretended causes of action against the several respondents. State ex rel. v. Railroad, 240 Mo. 35; State ex rel. v. Grimm, 220 Mo. 483; R. S. 1909, secs. 10298, 10300, 10301, 10314; McElroy v. United States, 164 U. S. 76. (2) Defendants are entitled to a jury trial. The commissioner erred in denying them that right, and respondents' motion to suppress the report for want of a jury trial should be sustained. Bank v. Anderson, 1 Mo. 244; Colon v. Lisk, 153 N. Y. 188; Railroad v. State, 75 Ark. 435; State v. Cobb, 24 Okla. 662; State ex rel. v. Townsley, 56 Mo. 107; People ex rel. v. Habird, 2 Idaho, 531; Metz v. Maddox, 189 N. Y. 460; Green v. Knox, 174 N. Y. 432; State ex rel. v. McDonald, 108 Wis. 8; Bradford v. Territory, 1 Okla. 366; Scott v. Neeley, 140 U. S. 106; Baylis v. Ins. Co., 113 U. S. 316; Brown v. Railroad, 69 Mo. App. 418; State v. Johnson, 26 Ark. 281; Attorney-General v. Sullivan, 163 Mass. 446. (3) The commissioner erred in ruling as a matter of law that the Statute of Limitations has no application to this cause, and that the State is not barred from this action by virtue of the Statute of Limitations invoked in the answers. R. S. 1909, secs. 1887, 1889, 1890, 1914, 4951, 4959; Shelby County v. Bragg, 135 Mo. 300; Wood v. Carpenter, 101 U. S. 135; St. Charles County v. Powell, 22 Mo. 521; Life Ins. Co. v. St. Louis, 98 Mo. 422; Dice v. Hamilton, 178 Mo. 81; Ames v. Kansas, 111 U. S. 449; Ratican v. Terminal Assn., 114 Fed. 666. (4) The commissioner erred in refusing to declare as a matter of law that the purposes of the Yellow Pine Manufacturers Association as expressed in the constitution and by-laws for six years prior to the institution of this suit were lawful. Anderson v. United States, 171 U. S. 604; State ex rel. v. Stock Exchange, 201 Mo. 181; Jayne v. Loder, 149 Fed. 984; Lawlor v. Loewe, 187 Fed. 522. (5) The Southwestern Retailers Association was not unlawful and there is not and

never has been any preferential or discriminatory relation between the members of that association and the respondents, or members of the Manufacturers Association. The constitution and by-laws of the Southwestern Retailers Association and the Code of Ethics advocated by them and lumber merchants in general are clearly lawful. Anderson v. United States, 171 U. S. 604; Gladish v. Stock Exchange, 113 Mo. App. 726; Bohn Mfg. Co. v. Hollis, 34 Minn. 223; Montgomery Ward & Co. v. So. Dakota Retail Merchants & H. D. Assn., 150 Fed. 413. (6) The so-called reciprocity resolution of 1904, affecting wholesalers and retailers, was a mere proposal of a committee; nothing was consummated; no defendant acted pursuant to the proposal, and the proposal itself was not unlawful. (7) The Yellow Pine Manufacturers' Association is not a trust or illegal combine or conspiracy to restrict or fetter commerce in yellow pine lumber, nor has it such effect, actual or potential; but its purpose, object and achievement are to make trade in yellow pine easy and honest; to make it possible for people to get what they want and plenty of it, at a less price than they would have to pay for any other structural material answering a like purpose, such as steel, cement, other lumber, pulp, brick, stone or terra cotta. Its work is beneficent, and not baneful. It is law-abiding, and not criminal. The membership, which is voluntary, charged at the rate of about twenty per cent per annum. Manufacturers united with it. as members or withdrew at their pleasure and no coercion or jeopardy was experienced in becoming members or in severing that relation. Membership did not insure the financial success of the manufacturer or even an easy road to fortune. The influence of the association is *pro bono publico*. (8) The Market Report is and always has been a legitimate and convenient publication which has stimulated, rather than stifled, trade and competition, and has been highly beneficial to the trade in gen-

eral. (9) There was no understanding between the defendants or members of the Manufacturers' Association to sell lumber at or according to the market prices quoted in the Market Report. (10) There was no agreement to limit the production of lumber by the defendants, or the members of the Manufacturers' Association during the year 1904, or at any other time. (11) It is the province of this court to determine the issues of fact and law irrespective of the conclusion of the commissioner and as though the report of the commissioner as to those issues was not before the court. If the State Constitution by providing that the Supreme Court may issue and determine writs of *quo warranto,* as is contended by the relator, vests in this court the jurisdiction and authority to try this sort of an action when issues both of fact and of law are to be determined, then it goes without saying that the court and not an attorney as agent of the court should exercise that jurisdiction. The judiciary no more than the legislative department of the government or the executive can farm out its prescribed functions. If our request and contention for a jury trial be denied, then we take it, this action now has a similar status to a law case which, having been referred without consent, is being heard upon exceptions to the report of the referee. Such a report, so far as the conclusions of the referee are concerned, both as to law and fact, are in no sense binding upon the trial court and do not relieve the trial court of the obligation to personally determine those issues. Utley v. Hill, 155 Mo. 232; Bank v. Donnell, 172 Mo. 384; State ex rel. v. Hurlstone, 92 Mo. 327; Small v. Hatch, 151 Mo. 300; Tobacco Co. v. Walker, 123 Mo. 662; Lack v. Brecht, 166 Mo. 242; Williams v. Railroad, 153 Mo. 487; Caruth-Byrnes Hdw. Co. v. Walter, 91 Mo. 484; Ely v. Owmby, 59 Mo. 437; Rains v. Lumpee & Co., 80 Mo. App. 203; Bender v. Matney, 122 Mo. 244.

FARIS, J.—This is an original proceeding by information in the nature of *quo warranto,* brought by the Attorney-General, to oust respondents, all of which are corporations, from their franchises to do business in this State, or to oust and fine them, because of alleged violations of our statutes leveled against pools, trusts and conspiracies.

The information, which was filed in this court on July 30, 1908, is, caption omitted, as follows:

"Comes now the State of Missouri, by Elliott W. Major, Attorney-General, who, in this behalf, prosecutes for and in the name of the State of Missouri, and informs the court that respondent, Chicago Lumber & Coal Company, and respondent, Freeman-Smith Lumber Company, are corporations duly organized and existing under and by virtue of the laws of the State of Iowa; that respondent, Arkansas Lumber Company, and respondent, Ozan Lumber Company, are corporations duly organized and existing under and by virtue of the laws of the State of Arkansas; that respondent, Detroit Timber & Lumber Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Michigan; that respondent, Dierkes Lumber & Coal Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Nebraska; that respondent, Glen Lumber Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Kansas; that respondent, Sawyer & Austin Lumber Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Wisconsin; and that respondent, W. R. Pickering Lumber Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Louisiana; all of said corporations having been organized for the purpose of engaging in the business of manufacturing lumber and buying and selling lumber, timber and timber lands, and all of said corporations

were at all the times herein mentioned duly authorized and licensed to do business in the State of Missouri as foreign corporations.

"Relator further informs the court that respondent, Alf Bennett Lumber Company, Badger Lumber Company, Bowman-Hicks Lumber Company, Bradley Lumber Company, Barr-Dubach Lumber Company, Crescent Furniture and Lumber Company, Colonial Lumber & Timber Company, Central Coal & Coke Company, Calcasieu Long Leaf Lumber Company, C. J. Carter Lumber Company, Clark & Bates Lumber Company, Diamond Lumber Company, Dierkes & Sons Lumber Company, Dixie Lumber Company, Fred B. Dubach Lumber Company, Frisco Lumber Company, Ferguson-McDaris Lumber Company, Foster Lumber Company, Grayson-McLeod Lumber Company, Geo. W. Miles Timber & Lumber Company, Geo. Surmeyer Lumber Company, Hogg-Harris Lumber Company, Ingram Lumber Company, Robt. Kamm Lumber Company, Long-Bell Lumber Company, Leidigh & Havens Lumber Company, Louis Werner Saw Mill Company, Lufkin Land & Lumber Company, Missouri Lumber & Mining Company, Missouri Lumber & Land Exchange Company, Missouri Tie & Timber Company, National Lumber Company, and Van Cleve Lumber Company, are now and at all the times herein mentioned were each a corporation duly organized under and by virtue of the laws of the State of Missouri, for the purpose of manufacturing lumber and buying and selling lumber, timber and timber lands, and that at all times herein mentioned each was and is engaged in said business of manufacturing lumber and buying and selling lumber, timber and timber lands in the State of Missouri.

"Relator further informs the court that respondents have created, entered into, become members of and participated in a pool, trust, agreement, combination, confederation and understanding among them-

selves, with each other and with other corporations and persons to relator unknown, with the purpose, design and view to regulate, control and fix the price to be paid by retail dealers in lumber and consumers of lumber in this State for lumber offered for sale and sold in this State, to maintain such price when so regulated and fixed, to regulate, fix and limit the amount and quantity of lumber manufactured and bought and sold, to control and limit the trade in lumber, and to limit competition in such lumber trade in the State of Missouri; that said respondents, by means of said pool, trust, agreement, combination, confederation and understanding, have regulated, fixed and limited the amount and quantity of lumber manufactured and sold, have increased, fixed and maintained the market price of lumber bought and sold in this State, and have lessened lawful trade and full and free competition in the importation, manufacture and sale in this State of Lumber, and are now unlawfully and illegally fixing and maintaining the price of lumber in this State, and restraining full and free competition in the importation, manufacture and sale of lumber in this State; all to the great detriment and damage of the purchasing public and the people of the State of Missouri.

"Relator further states that by reason of the participation of said respondents in the pool, trust, agreement, combination, confederation and understanding as herein stated, and by reason of the acts and things done by respondents as herein set forth, said respondents have been guilty of illegal, willful and malicious perversion and abuse of the franchise, licenses and authority severally granted to them by the State of Missouri, and illegal and unlawful usurpation of privileges, franchises and authorities not granted to them by the State of Missouri.

"Wherefore, the Attorney-General, prosecuting in this behalf for the State of Missouri, prays the consid-

eration of the court in the premises, and that each respondent corporation may be excluded from all corporate rights, privileges and franchises exercised or enjoyed by it under the laws of the State of Missouri, and that its franchise, license and certificate to do business in this State be declared forfeited, and that all, or such portion of its property as the court may deem proper, be confiscated unto the State, or in lieu thereof, a fine be imposed upon it in punishment of the perversion, usurpation, abuse and misuse of franchise as herein described.''

No service was ever had on the respondent, the Frisco Lumber Company, for the reason that it is beyond the jurisdiction of the court, and no answer or return has been made by it in this cause.

The following-named respondents have been dismissed from this action by the Attorney-General, for the alleged reason that no evidence is found in the record inculpating them, to-wit: Badger Lumber Company, Clark & Bates Lumber Company, Diamond Lumber Company, Dierkes & Sons Lumber Company, George W. Surmeyer Lumber Company, Missouri Tie & Timber Lumber Company, National Lumber Company, Barr-Dubach Lumber Company, Fred B. Dubach Lumber Company, Crescent Furniture and Lumber Company, Frost-Trigg Lumber Company, and Sawyer & Austin Lumber Company.

The respondents remaining in the record made and filed on different days, but for the most part on November 12, 1908, separate returns and answers, admitting their respective incorporations and denying generally that they had created, entered into or had become members of, or had participated in, any pool, trust, agreement, combination, confederation or understanding with any other corporation or person for the purpose, design or view to regulate, or control, or fix the price to be paid for lumber by retail dealers in

260 Mo.—15

lumber or by consumers of lumber in Missouri, or to maintain such price when so regulated or fixed, or to regulate, fix or limit the amount or quantity of lumber manufactured or bought and sold, or to control or limit the trade in lumber, or to limit the competition in such lumber trade in the State of Missouri, in such manner as to fully negative the allegations in the information in that respect.

The Missouri Lumber & Mining Company and Missouri Lumber & Land Exchange Company answered jointly and in addition to the other answers, and set up that the statutes under which the information was filed were violative of section 1, article 14, of the Constitution of the United States, and are, therefore unconstitutional and void.

On December 16, 1908, this court, sustaining the motion of the Attorney-General in this behalf, appointed a special commissioner to take testimony in this case, as by the below order (formal parts omitted) will more clearly appear:

"Now at this day, it appearing to the court from the pleadings in the above entitled cause, that issues of fact are joined therein, therefore, on motion of the Attorney-General, that a special commissioner be appointed by the court to take the testimony upon the issues joined in said cause, it is ordered by the court that Judge Theodore Brace of Paris, Missouri, be and he is hereby appointed special commissioner to take the testimony upon the issues joined in said cause, with full power and authority to issue subpoenas, compel the attendance of witnesses, and the production of papers, books and other documents, to issue attachments therefor, and to hear and determine all objections to testimony, and to admit or exclude the same, in the same manner and to the same extent as this court might do in the trial of the case before the court, and to report the testimony with his findings of fact thereon, together with his findings as to the law upon

each issue tendered to him by the respective parties, and to state his conclusions of law in his final report, exceptions to the findings of fact and law so made by said special commissioner, to be filed by either party so desiring within ten days after the filing of the special commissioner's report and findings.''

Afterwards various respondents filed their separate amended answers, again admitting their respective corporate capacities, denying specifically the other allegations of the information; the Missouri Lumber & Mining Company and the Missouri Lumber & Land Exchange Company in addition setting up the plea of the three-year Statute of Limitations and likewise the plea of the five-year Statute of Limitations; also that the Missouri statutes upon which the information was grounded were in conflict with the provisions of section 1, article 14, of the Amendments to the Constitution of the United States, and, therefore, unconstitutional and void in that said act was alleged to abridge the privileges and immunities of respondents and to deprive them of their property without due process of law and denied to respondents equal protection of the law and other provisions thereof. The remaining respondents made similar answers, attacking the said statutes of Missouri in question upon the additional grounds, however, that they were in violation of the Constitution of the State of Missouri in particulars fully set out in said answers, among which parts alleged to be violated was section 28, article 4, which provides that no bill shall contain more than one subject, etc.; section 21 of article 2, provides that private property shall not be taken or damaged for public use without just compensation; section 53 of article 4, provides that the General Assembly shall not pass any local or special laws regulating the practice or jurisdiction by changing the rules of evidence in judicial proceedings, and other provisions of said Constitu-

tions, and for such reasons said statutes are unconstitutional and void.

Afterwards, and prior to the taking of any testimony in the case, Judge Brace tendered his resignation as special commissioner, and the same being formally accepted, Robert M. Reynolds, Esq., was, by this court, on the 14th of November, 1910, by an order then made, appointed special commissioner to take evidence. This order was similar in verbiage in all material respects to that above set out in this behalf and the same need not again use up space here. Special Commissioner Reynolds having duly qualified, on the 22nd of May, 1911, began the taking of testimony in the case. The taking of this testimony (which embraces approximately three thousand printed pages, and is accompanied by some two hundred pounds weight avoirdupois of exhibits) having been completed, Commissioner Reynolds has filed the same (with the exhibits) with us, together with his findings of fact and conclusions of law, in all things pursuant to the terms of the order appointing him.

The respondents, upon the hearing herein before Special Commissioner Reynolds, hereinafter for brevity styled simply "commissioner," and before and at the time the first evidence was offered herein by the State, objected to the hearing and trial before the commissioner for the reasons assigned by them: "That this proceeding was a suit, the object and purpose of which was to confiscate under the statutes the whole of the property of each of the defendants or respondents, or such portion of respondents' property as the court might deem proper, or to impose a fine upon each of the respondents, and because the Constitution of the State of Missouri, and the equality of rights guarantees that the right of trial by jury, as heretofore existing, shall not be denied," and claimed that right to trial by jury of the issues raised, and to that end invoked article 2 of the Constitution of the State guar-

anteeing the right of a jury trial. They also invoked the Fourteenth Amendment of the Constitution of the United States, which guarantees the right of all citizens to be deprived of their property only by due process of law, and equal protection of the law to all citizens. Respondents furthermore at this first meeting for the taking of proof and before any material evidence was put into the case objected "to the introduction of any further evidence under the allegations of the State's pleadings, for the reason that the information, or writ, neither separately nor together states sufficient facts to constitute a cause of action against the defendants or either of them."

At the close of the evidence offered in behalf of the State respondents made and filed their separate demurrers thereto based upon the following propositions: First, that the evidence did not sustain the allegations of the information as to the demurring respondents; second, the evidence did not sustain the allegation of the information as to any respondent; third, on the pleadings and evidence adduced relator is not entitled to the relief prayed for; fourth, from the pleadings and evidence adduced relator had no cause of action against the demurring respondent or any respondent; fifth, that there is a misjoinder of parties defendant and likewise a misjoinder of causes of action. Some of said demurrers invoked section 22, article 2; section 28, article 2; section 30, article 2; section 28, article 4; section 53, article 4, of the Constitution of the State of Missouri, with which provisions the said statutes were alleged to be in conflict.

By agreement this motion and these demurrers were passed by the commissioner to be heard upon the argument of this cause upon all the issues raised in this case and for final determination with all the other issues in the case.

The facts of this case, as contradistinguished from a recital of the pleadings, steps taken and procedure,

as we gather them from this voluminous record of the evidence, aided as we have been by the able, exhaustive and painstaking labors of the learned commissioner, are about as follows:

The yellow pine lumber industry in the United States is extensive, a large amount of capital is employed in its prosecution; but so far as the manufacture and wholesale thereof is concerned, the capital employed is under the direction and control of comparatively a small number.

The dealers in the trade may be classified as manufacturers, wholesalers and retailers. Under the language of the trade a certain "off-color" variety of those dealers are denominated "poachers."

The manufacturer, as the name implies, cuts and saws the lumber from the tree or "stumpage." The wholesaler handles the manufactured product in large quantities and markets the same, generally to the retailer, but in some instances *direct to the consumer*. In the latter instance he comes within the definition of "poachers." The retailer sells directly to the consumer. In instances where he maintains a yard in a community where he sells, carrying a certain stock, meeting the requirements of so-called ethical association rules, hereinafter more fully explained, he is known in the trade as a "regular" and "legitimate retailer;" where he sells in a community where he has and maintains no yard, but in which some other dealer does maintain one, in trade parlance he comes within the definition of a "poacher." Some manufacturers and wholesalers are also engaged as retailers.

Various kinds of lumber are manufactured and marketed in the various portions of the United States, such as white pine, fir, western pine, cypress, hardwood, redwood and yellow pine. Dealers in this commodity seem to have organized themselves into various bodies and associations for certain purposes, ostensibly by classes, but in all of which until 1907 the man-

ufacturers and wholesalers were members and repre=
sented.

The yellow-pine product sold and consumed in
Missouri at the time of the institution of this suit
equaled about 66 per cent of the entire lumber product
handled in Missouri. The authorized capital by va-
rious corporations engaged in its manufacture and
wholesale in Missouri aggregates the sum of $16,359,-
000, but the number of such corporations is limited,
as well also the controlling characters interested there-
in.

About the year 1890 certain manufacturers and
wholesalers in southern territory, and particularly in
the yellow-pine territory, organized the Southern Lum-
ber Manufacturers' Association, now, and at the time
of the institution of this suit, known as the Yellow
Pine Manufacturers' Association. Originally member-
ship in the association embraced the manufacturers of
any variety of lumber, operating within the territory
of the association, but in 1906 membership was lim-
ited to yellow-pine manufacturers and wholesale deal-
ers, and at the same time the name was changed to
correspond. Similar organizations have been and are
now in existence representing other varieties of manu-
factured lumber. These various manufacturing and
wholesale associations are now represented in one com-
mon head or association in the United States known as
"National Lumber Manufacturers' Association,"
which was organized about the year 1902. About
twelve different associations, including that here com-
plained of, are affiliated in the National.

The respondents, except as to some of the same
as to which this proceeding has been dismissed, were
at the institution of this suit or recently before the
same was begun, members of the Yellow Pine Manu-
facturers' Association. Their respective connnection
therewith, their capital stock, their origin and domi-
cile being as follows:

Alf Bennett Lumber Company; incorporated in Missouri, August 2, 1905; present capital, $50,000; a member of the association from 1906 to the date of the commencement of this suit.

Arkansas Lumber Company; incorporated in Arkansas; authorized to do business in Missouri, January 18, 1905; capitalization represented by business in this State, $3000; member of the association from 1902 to date of commencement of this suit.

Bowman-Hicks Lumber Company; incorporated in Missouri, June 27, 1900; present capital, $1,250,000; became a member of the association in 1902 and remained such to the date of this suit.

Bradley Lumber Company; incorporated in Missouri, June 14, 1901; capital, $350,000; a member of the association from 1903 to the date of this suit.

Calcasieu Long Leaf Company; incorporated in Missouri, April 9, 1906; capital $1,200,000; became a member of the association in 1908.

Central Coal & Coke Company; incorporated in Missouri, April 6, 1893; capital, $7,000,000; about one-half of which is employed in the coal business; a member of the association from 1900 to 1907; was not a member at the date of this suit.

Chicago Lumber & Coal Company; incorporated in Iowa; authorized to do business in Missouri, May 27, 1906; capital represented by business in this State, $10,000; member of the association from 1902 to the date of this suit; never owned any mills, was never a manufacturer, but merely a wholesaler.

Colonial Lumber & Timber Company; incorporated in Missouri, August 29, 1902; present capital, $250,000; a member of the association from 1903 to the date of the commencement of this suit.

C. J. Carter Lumber Company; incorporated in Missouri, March 23, 1896; capital $25,000; member of the association from 1902 to the date of this suit. It

never owned any mills and was never engaged in the manufacture of lumber, but was only a wholesaler.

Detroit Timber & Lumber Company; incorporated in Michigan; authorized to do business in Missouri in 1900; capital represented by business in Missouri, $5000; a member of the association from 1902 to 1905, but not thereafter.

The Dierkes Lumber & Coal Company; incorporated in Nebraska; authorized to do business in Missouri in 1902; capital represented by business in this State, $30,000; a member of the association from 1903 to the date of this suit.

Dixie Lumber Company; incorporated in Missouri, July 19, 1901; present capital, $75,000; a member of the association from 1905 to the date of this suit.

Ferguson-McDaris Lumber Company; incorporated in Missouri, December 8, 1906; capital, $75,000; was a member of the association during the year 1907, but not afterwards.

Foster Lumber Company; incorporated in Missouri, December, 1895; capital $200,000; a member of the association from 1902 to the date of this suit.

Freeman-Smith Lumber Company; incorporated in Iowa; authorized to do business in Missouri in 1901; capital represented by business in this State, $10,000; a member of the association from 1903 to the date of this suit.

Geo. W. Miles Timber & Lumber Company; incorporated in Missouri, April, 1907; capital, $20,000; a member of the association from 1907 to the date of this suit.

Glen Lumber Company; incorporated in Kansas; authorized to do business in Missouri, January 21, 1907; capital represented by business in Missouri, $10,000; a member of the association from 1906 to the date of this suit.

Grayson-McLeod Lumber Company; organized in Missouri, June 5, 1873; capital, $1,000,000; member of the association from 1903 to the date of the commencement of this suit.

Hogg-Harris Lumber Company; organized in Missouri, February 1, 1901; capital, $75,000; member of the association from 1905 to the date of this suit.

Ingham Lumber Company; incorporated in Missouri, March 15, 1902; capital, $500,000; member of the association at the time of the commencement of this suit.

Leidigh-Havens Lumber Company; incorporated in Missouri in 1896; capital, $200,000; member of the association from 1902 to the date of this suit.

Long-Bell Lumber Company; incorporated in Missouri in 1884; capital, $2,000,000; member of the association from 1892 to the date of this suit.

Louis Werner Saw Mill Company; incorporated in Missouri, May, 1899; capital, $150,000; member of the association from 1905 to the date of this suit.

Lufkin Land and Lumber Company; incorporated in Missouri, June 14, 1905; capital, $8,000; member of the association from 1906 to the date of this suit.

Missouri Lumber & Land Exchange Company; incorporated in Missouri, December 31, 1897; capital, $6000; member of the association from 1902 to the date of this suit. Its sole business has been that of a selling agent for three manufacturing companies.

Missouri Lumber & Mining Company; incorporated in Missouri, December 9, 1880; present capital, $500,000; member of the association from 1892 to the date of this suit.

The Ozan Lumber Company; incorporated in Missouri, October, 1887; capital, $200,000; member of the association from the year 1905 to the date of this suit.

Robt. Kamm Lumber Company; incorporated in Missouri, February, 1907; capital, $25,000; member of the association from 1907 to the date of this suit.

Van Cleve Lumber Company, a corporation under the laws of Missouri; became a member of the Yellow Pine Association prior to June 14, 1904, and was present at the "curtailment meeting" and thereafter remained a member of the association till subsequent to July 30, 1905.

W. R. Pickering Lumber Company; incorporated in Iowa; authorized to do business in this State in 1899; capital for business in this State, $2000; member of the association from 1902 to 1907, and not afterwards to the time of this suit.

It would appear that the total amount of yellow-pine lumber cut per annum about the year 1907 or 1908 was 9,000,000,000 feet, and that the amount cut by mills represented in the association was 3,628,255,978 feet.

On the date of the filing of this suit the membership of the Yellow Pine Association was about 300. Captain John B. White (connected with some of the respondents herein) seems to have been the first president, and George K. Smith its secretary. (George K. Smith was also secretary of the National.) The office of secretary has been held continuously by the said George K. Smith since the organization of the association, with the exception of a period of two years, and he has maintained his office, as well as that of the association, at all times in the city of St. Louis, Missouri. A more concise statement of this organization and its operations will be hereinafter more fully set out.

The Yellow Pine Association, as did its predecessor, the Southern Lumber Manufacturers' Association, which it succeeded in 1906, held regular annual and semi-annual meetings. It was a voluntary association and had a written constitution and by-laws. It had a board of directors; its officers were president, first vice-president, treasurer and secretary, assistant secretary and a number of additional vice-presidents.

The duties of these various officers and of the board of directors were in a general way provided in the constitution. The board of directors were given authority to originate and execute such plans and measures as they deem proper to carry out the objects of the organization, and authorized to command the secretary as their administrative agent in the execution of such plans; the board of directors and the secretary were clothed with all the authority of the association, except to amend the constitution. No definite object of the association seems to have been stated in words in the constitution or by-laws prior to the year 1906, except that members of the association should not be privileged to sell to consumers or nonresident dealers in towns where there is a member of a retail association doing business, and the object otherwise can only be ascertained from the policies inaugurated, or sought to be inaugurated, and the works and acts flowing therefrom.

The constitution provided a manner for the amendment by the members of the association and gave authority to the board of directors to make all by-laws deemed advisable and expedient to carry out the work of the association. A copy of the constitution and by-laws of the association for the year 1902 and as they remained down until the year 1906 was produced and identified by the secretary of the association, and introduced in evidence. In 1906 certain amendments were made. The name was changed and eligibility was limited to manufacturers and wholesalers of yellow pine. A new section was added to the constitution, designated as article 3, which is as follows:

"The object of this association shall be to secure a full understanding of the conditions surrounding the lumber market in the territory covered by this association; the shipment of uniform grades for the inspection of lumber; to promote uniform customs and usages among manufacturers of lumber, to procure

and furnish to these members such information as may tend to protect them against unbusinesslike methods of those with whom they deal, and such other information as may be found for the benefit of the members of the association; and to propose and carry out such other measures as may be deemed for the welfare and in the interest of the manufacturer of lumber who shall be members of this association.''

The following amendment was added to the by-laws by the board of directors in the same year:

''A committee of thirty shall be appointed by the president, to be known as the Market Committee, whose sole duty it shall be to ascertain from time to time and in such manner as they deem advisable, the prevailing quotations and market prices of various classes of yellow-pine lumber, and the existing conditions as to supply and demand for the same, and to cause the facts thus ascertained to be disseminated from time to time among the members of the association; it shall be the duty of the secretary to aid said committee in the discharge of its said duty.''

As thus amended, the constitution and by-laws continued until the institution of this suit. The secretary, George K. Smith, was custodian of all the files, records, documents, and copies thereof, of the Yellow Pine Association and its predecessor, the Southern Lumber Manufacturers' Association, but was unable to produce any of the same for use in this hearing prior to the year 1906, except the constitution of 1902. *He had destroyed all other records as well as his letters, "as junk."* An official copy of the constitution and by-laws, as amended in 1906, is found in the printed record. Article 1 thereof provides the name of the association; article 2, the eligibility required for membership and the dues and membership fees required; article 3 provides the objects of the association—being the amendment hereinbefore stated, which appeared for the first time in 1906, as we have seen;

articles 4 and 5 provide the official duties. Article 6 provides:

"The board of directors shall have power to hold meetings at such times and places as they may think proper; to appoint committees from the membership of the board of directors or the association, and shall appoint from their number three members who shall constitute a board of arbitration; employ a secretary, print and circulate documents; raise funds and appropriate the same—and to advise and to carry into effect such measures as they deem proper and expedient to promote the objects of the association, and the secretary shall at all times be subject to their discretion."

Article 7 provides when and how the officers and directors are to be chosen and the respective lengths of terms of office of each. Article 8 provides for annual and semi-annual meetings of the association in January and July of each year, upon specific dates to be named by the board of directors upon written notice of such date to each member of the association; also for special meetings to be called by the president or a majority of the board of directors upon written notice to the members. Article 9 provides certain duties for various officers; among other things, that:

"It shall be the duty of the secretary to give notice of and attend all meetings of the association and the board of directors; to keep a record of all their doings; to keep a list of all the members of the association; to collect all assessments and pay them over to the treasurer; to prepare under the direction of the board of directors an annual report of their transactions and the condition of the association; to prepare and cause to be published every three months a list of all members of the association, and shall mail the same to all manufacturers of yellow-pine lumber; and shall perform any and all duties which shall be required of him by the board of directors, and generally

to devote his best efforts to forward the interests of the association.''

Article 10 provides that the board of directors shall have authority to make by-laws for the conduct of the business of the board and of its meetings, and for the business and meetings of the association, and for the protection of all interests confided to its care. Article 11 provides for the amendment of the constitution by a majority of the members at any annual or semi-annual meeting upon notice of such propose. amendment given by the secretary to each member thirty days in advance of the meeting. Article 12 provides that the board of directors shall have the authority to employ a chief inspector with one or more assistants, the chief inspector to be under the control of the board of directors and under the immediate control of the secretary.

The by-laws provided generally for the order of business of the association, including committee reports and that the board of directors should make such additional by-laws from time to time and rules for the transaction of the business of the association as its development might require; for the investigation of claims of members, and also for the appointment of the committee of thirty, to be known as a ''Market Committee.''

It appears, also, that the constitution and by-laws, as early as 1892 and as late as 1900, contained the following article:

''The members of this association shall not be privileged to sell to consumers or non-resident dealers in towns where there is a member of a retail association doing business.''

The association maintains offices in St. Louis, Missouri, the secretary in charge. The chief inspector has his office with the secretary, and his assistants report to him there. The association is maintained from year to year by dues collected from its members based

upon the amount of lumber sold and manufactured, there being a minimum fee of $10. At the time of the institution of this suit some $75,000 was required annually for the expenses of the association and raised, in the manner indicated.

The work of the association was such as had a direct bearing upon the lumber interests and trade from the beginning. It adopted a system of classification, uniform grades and sizes into which yellow-pine lumber was to be made, and by which it was to be known and bought and sold, and to which manufacturers were required to conform, and to which they did conform throughout the yellow-pine district. These classifications and grades were printed and widely circulated throughout the trade.

In the clause last above are the commendable things which it did. It inaugurated the system of inspection about the year of 1898, which has been continuously followed since such time, through inspectors appointed by the authority of the association and in its employ, by which the grading, size and weight rules of the association were enforced among manufacturers of yellow pine, and through which, also, the association and its officers and members were kept informed as to the actual amount of yellow pine in stock by the various manufacturers thereof, and the weights and grades thereof. These inspectors made written reports of their findings in triplicate; one copy was sent to the manufacturer, the chief inspector and the secretary of the association. Part of the work of these inspectors was good and bore good results in the trade; part of it was evil.

The chief inspector had an office with the secretary of the association in the city of St. Louis. Information as to the amount of lumber manufactured and of the output is furnished to the secretary of the association by the various mill managers of the respective mills; the amount of stock on hand by manufacturers

and wholesalers was furnished by them to the secretary upon inquiry every thirty days. The association had about eighteen inspectors at the time of this suit, seven of whom are also employed in settling disputes between wholesalers and retailers growing out of transactions of lumber sales and purchases, and in such cases the decisions of the inspectors prevail in 99 cases out of 100. The mills were inspected about every thirty days. The secretary of the association thus acquired information constantly of the amount of lumber being manufactured and by whom, the amount being sold and by whom, and the amount of stock remaining in the hands of each respective manufacturer, together with the grades and sizes thereof.

The secretary also seemed to gather such information of the same nature and character as possible from yellow-pine mills and manufacturers not members of the association. The association also inspected lumber through its inspectors for mills not members of the association.

In its annual and semi-annual meetings, the secretary made a report to the association imparting such information as he desired, touching, on the part of the board of directors, of himself, or those under him, of the condition of the affairs of the association, or of the trade, of the amount of lumber being cut and sold, and of such other matters as he deemed advisable, and made such recommendations as he desired. The president of the association usually delivered an address touching matters of interest to the association, reviewing the work accomplished and recommending work to be inaugurated or undertaken.

The association had committees on "Grades," "Weights," "Values," "Good of the Association," "Resolutions," "Membership and Revenue," "Auditing of Accounts," "Terms of Sale," "Price List," to which were referred appropriate matters for their con-

sideration and for report back to the association. These matters were usually provocative of discussion by the various members.

Among those most prominent in conducting the affairs and proceedings of the association were found the largest producers of yellow-pine lumber in the country; persons interested in various corporations controlling mills of large production and output, and in various wholesale and selling agencies of large business, and some of whom were also among the largest retail dealers of the country with extensive lines of retail yards. J. B. White, who claims to have originated the idea of the formation of the association, was its first president, punctual in attendance upon its meetings, a member of its board of directors almost continuously since its organization, prominent in discussion of matters before the association, active in committee service, being a member of the association's "Committee on Values" until 1906, and appointed by the association at that time as a member of the "Market Committee," otherwise known as "Committee of Thirty," and, likewise, upon the abolition of the Committee on Values under the direction of the board of directors, became one of the correspondents of the secretary of the association, George K. Smith, advising with said Smith from time to time as to prices to be quoted to the trade for yellow-pine lumber. Mr. White has extensive interests in Missouri and Louisiana, and perhaps elsewhere. He was general manager of the Missouri Lumber & Mining Company with an authorized stock for Missouri of $500,000, and with an annual output of 54,000,000 or 55,000,000 feet of lumber. He was also manager of the Missouri Lumber & Land Exchange Company, a selling corporation or agency, selling for the Missouri Lumber & Mining Company, the Louisiana Long Leaf Company, the Louisiana Central Company, the Ozan Land & Lumber Company, with an aggregate output of about 165,000,000 feet per an-.

num. He also owned as late as 1904 the controlling interest in nine lumber yards and had a partner interested in many more. He was also a member of the Joint Trades Relations Committee, which brought about the trades-relation agreement between the Southern Manufacturers' Association and the allied retail lumber association of the country in which the retailers were members, and under which the Yellow Pine Association manufacturers agreed to sell only to retail members of the association, and in which the retail members agreed to buy only of the Yellow Pine Manufacturers' Association members.

R. A. Long had been a member of the association for fifteen years; was its president in the years 1904 and 1905. Was from time to time a member of its board of directors and was influential in establishing the policies of the association, being in the habit of attending the meetings of the association, delivering addresses as its president, and likewise as a lay member. He was, with Mr. White, a frequent member of the Committee on Values of the association until 1906, and became and continued one of the correspondents of the secretary, George K. Smith, concerning prices of yellow-pine lumber. Mr. Long was connected with the Long-Bell Lumber Company of Kansas City since 1884, and was for a number of years its general manager. The Long-Bell Lumber Company has an authorized capital of $2,000,000 and manufactured about 275,-000,000 feet of lumber annually in 1906, 1907 and 1908, and for a number of years prior thereto had annually manufactured about 200,000,000 feet. The Long-Bell Lumber Company likewise operated about 62 retail yards at points in Kansas. Mr. Long was also interested in the Calcasieu Long Leaf Lumber Company and in the Lufkin Land & Lumber Company, both of said companies being engaged in the yellow-pine industry along with the Long-Bell Company. The extent of the business of neither the Calcasieu Company nor the Lufkin

Company appears in the record; the authorized capital of the one, however, is $1,200,000, and for the other for Missouri is $8000.

S. H. Fullerton, likewise the president of the association for one or more years, a member of its board of directors at times, prominent in discussions upon the floor of the association, a member of the Committee on Values and of the Market Committee of Thirty of 1906, and correspondent of George K. Smith as to prices of yellow-pine lumber, influential in the affairs and policies of the association, was largely interested in the lumber trade. He was president of the Chicago Lumber & Coal Company, a wholesaler of yellow pine, with annual sales of about 200,000,000 feet, and with an authorized capital stock of $350,000. The Chicago Lumber & Coal Company also operated a large number of retail yards, about sixty-two, in the State of Illinois, but had its chief business office in the city of St. Louis. Mr. Fullerton was also president of the Bradley Lumber Company, a manufacturing concern which manufactured about 200,000,000 feet of lumber per annum, and which companies he ordinarily represented in the meetings of the association. He also sold for smaller companies and mills to whom he made loans. He also owned stock in the Colonial Lumber & Timber Company.

Nelson McLeod, at one time president of the association, member of the board of directors at times, member of the Committee on Values for the association, member of the Market Committee of Thirty, and correspondent of George K. Smith as to yellow-pine values, was president of the Grayson-McLeod Lumber Company, with an authorized capital of $1,000,000.

Charles S. Keith, member of the Committee on Values, Market Committee of Thirty, and one of George K. Smith's correspondents, was general manager of the Central Coal & Coke Company, with an authorized capital of $7,000,000, manufacturing about

85,000,000 feet of lumber per year; the capital of his company being employed, however, in both the coal and lumber business. .

An examination of the record will show that the affairs of the association were dominated by men of the character mentioned, few in number, but having large interests and controlling large business and trade. It readily appears, if the figures in the record are correct, that the few names mentioned produce and handle a large part of the output of the mills of the association.

## PRICE LIST.

From its organization the association issued a price list to its members and to the trade. This was designated as the flat-rate sheet price list, or in booklet form as the Yellow Pine Price Current, as published and circulated down to the year 1906, and subsequent to that time as a market report. This price list was made up by taking the association's established classifications, grades and sizes, and quoting prices for the respective items thereon, for sale and delivery by manufacturers and wholesalers at points from places of shipment within certain territory to be reached upon certain freight rates; the freight rate being included in the price quoted. No quotations were made for delivery at points where the freight rate was in excess of forty-five cents from place of shipment, and the minimum freight rate employed was ten cents. The work of preparing this list, including the naming of the prices to be quoted, was committed to a committee of the association at first called the Price List Committee, and afterwards called the Committee on Values down until the year of 1906.

It seems that in the latter part of the year 1905 or the early part of the year 1906, certain investigations of the operations of the association or certain of

its members, alleged to be in violation of the laws of the State of Mississippi leveled against combinations and conspiracies in restraint of trade, were inaugurated by that State, and the board of directors of the association early in 1906, in view thereof, adopted the following resolution upon the part of the association and entered the same upon the record of their proceedings:

"Resolved, That neither the Committee on Values nor any other committee or officer of this association shall make to the association or any member thereof any report other than of existing conditions applicable to the trade and of existing prices; nor shall this association, nor any officer or committee thereof, make either to the association as a whole or to any member thereof, any recommendation affecting prices to be charged for lumber or the amount of the product or output thereof."

The minutes of the board also made reference to the Mississippi investigation and a proposal for an early meeting in St. Louis, at which attorneys from various States were to be present and furnish opinions as to the proper handling of all questions coming before the association which could in any way conflict with the State or Federal statutes governing trusts or combinations. The date of the meeting was reserved.

At the annual meeting of the association in January, 1906, following the adoption of the above-quoted resolution by the board of directors, no report was made by the Price List Committee or the Committee on Values. The proposed meeting of the board of directors was had on the 27th and 28th days of February, 1906, at which various counsel were present, and a new arrangement was made for the formulation of the price list. Section 5, providing for the appointment of a committee of thirty by the president, to be known as a "Market Report Committee," was added to the by-laws, and the committee was appointed and the work

of preparing and getting up the price list was assigned
to it. The list of members of this committee is found
in the record and embraces many whose names have
frequently been connected with the Price List Com-
mittee and the Committee on Values, and all of whom
had large interests in the lumber trade. This commit-
tee, however, failed to take up the work assigned it.
This failure seems to have been under the advice of
counsel. It met, however, in October, 1906, in connec-
tion with the board of directors, but issued no report,
and thereupon the board of directors authorized and
directed George K. Smith, secretary, to take the matter
in hand and to make and prepare the prist list or "mar-
ket report," as they at that time termed it. Thereaf-
ter the same was gotten up by the said George K.
Smith, secretary, and the prices quoted were named
by him with the aid of a list of correspondents, herein-
after referred to, and was to the time of the institu-
tion of this suit published and promulgated by him to
the members in the trade under the name of the "Mar-
ket Report."

The Old Price List Committee and the Committee
on Values as well were usually appointed at annual
or semi-annual meetings of the association upon mo-
tion, the number thereof being provided in the motion.
The members usually served until the next meeting of
the association, or for a year, and were either reap-
pointed or others were appointed in their stead. The
list of those reported in the record from time to time
as members of this committee embraces members of
large interests, as J. B. White, R. A. Long, Nelson Mc-
Leod, S. H. Fullerton, Charles Keith, Isaac Enoch, and
men of like standing and interest in the lumber trade.
The members of this committee in the aggregate usu-
ally represented interests largely predominant in the
business represented in the association.

These committees from the very beginning made
reports to the open meetings of the association down

until the year 1906, and since which time no reports have been made direct to the association; but George K. Smith, under the authority of the board of directors and his list of correspondents, has had complete control and has issued the report direct without submitting it to the members in the association meetings. The reports of these committees were frequently discussed by various members in open meeting and were either adopted as submitted or as amended, and were then recorded by the secretary and promulgated by him.   A copy of the report of this committee is found in the record, and except as to prices quoted and named and new grades and sizes added is substantially the same as all other reports of the committee.

When George K. Smith, under the direction of the board of directors, took charge of the report in 1906, he appointed a list of correspondents for the association, 63 in number, known as "Correspondents of the Yellow Pine Manufacturers' Association." This list was appointed under the authority of the board of directors.   The members were manufacturers of yellow pine, and practically all were members of the association.   Each member was given a number and correspondence· was carried on by that number.   In the number are found many who were at various times associated on the price list, values and market report committees of the association.

One of the purposes of this list of correspondents was to furnish information when requested by George K. Smith as to prices at which they were selling lumber.   This information served a double purpose, for it also disclosed to George K. Smith, secretary, whether or not they were observing the association price list. Secretary Smith in undertaking the correspondence, enclosed a sheet which was a copy of the price list in force, with a blank column at the right of the column of prices quoted, with a request to the correspondent to indicate any items quoted thereon which he was selling

or offering at a different price from that named in the list. The correspondent, in answering the inquiry, if he was selling or offering at the price list, would make no change upon the slip, but would simply check the blank spaces opposite in the blank column. 'If there were items which he sold lower than the list, he would insert the price at which he had sold or was offering in the space in the blank column opposite the item; if higher than the price list, the same method was employed.

That Secretary Smith in making up the market report was not at all times governed by the replies received is illustrated by the said report for February 25, 1908. From the compilation above shown it appears that of those replying to the secretary's inquiry as to "Heart Face Flooring, Grade 'B' and Better," *twenty-five answered that they were making the same price as the January list, six that they were quoting lower, and one that he was quoting higher; the price was advanced by the secretary in the new report fifty cents over the report for January.* He added this fifty cents, according to his statement, from knowledge he had of the conditions of the market and from stocks on hand by different dealers in this particular line. On "Edge Grain Flooring" ninety-two correspondents replied that they were quoting the same price as the January list; five that they were quoting higher, and thirteen that they were quoting lower. The secretary advanced the price above the list fifty cents. In all instances, the replies showed that a greater number were selling at less price than the prices quoted in the January list, than were selling for a greater price; but in each instance where the price was changed at all it was advanced for the February list. It was never the policy of the secretary to quote a lower price if an equal number quoted the list and any above.

An investigation of the official proceedings and meetings of the association shows that the matter of

selling prices of lumber was one of the chief matters
to which the association gave its attention. In fact, all
the work of the association seemed to tend in this di-
rection, and to keep the central body of the associa-
tion in touch with and in control of all the matters
touching the trade by which prices were affected. In
the various discussions of the report of the Market Re-
port Committee by members upon the floor of the asso-
ciation it seemed that the general desire expressed was
to maintain a uniformity of prices among the dealers
generally and have higher prices upon the market. In
1901 the committee reported through N. W. McLeod
that it was impracticable at that time to recommend a
uniform list, as stocks were very much broken and
trade was good, and many members found it necessary
to make prices on some items considerably higher than
would be satisfactory to others, and, therefore, a list
as a basis of minimum market values was recom-
mended. It was moved that this report be adopted,
and that all members be urged to have the list sent out
to the trade. In 1892 the report of the Price List Com-
mittee was made, and the secretary said in offering the
same:

"I will say for the benefit of those who may not
have seen the list adopted by the Arkansas State As-
sociation that our Price List Committee has paid the
gentlemen the compliment of considering their judg-
ment as perfect, as they have made no changes what-
ever in the list adopted by the Arkansas Association
at Little Rock on the 13th day of July, considering
that that was a fair expression of the market and no
changes have been made. This is a slight advance
over our association price list that was adopted April
13th and readopted at Memphis, Tennessee, May 11th.
The advance is on finishing boards and some length of
dimension. Now I will read the entire list, so that all
may know what it is."

In 1903 the committee made a report through the chairman, R. A. Long, which, among others, contained the following observations:

"In view of the extraordinary conditions we believe that the trade should stand an advance of fifty cents per M on all items on the right hand side of the list and some items on the left hand side. If err we must, we desire to be on the side of conservatism, and so we recommend the reaffirmation of the list adopted May 2nd, and of requesting our members to adhere to these prices. By so doing for a period of twenty days they will be able to secure all the business wanted at said prices. We also believe that by adhering to this condition that by August 15th a good liberal advance can be made."

In January, 1904, in an address entitled "Marketing of Yellow Pine," delivered before the association at New Orleans, Captain J. B. White, among others, made the following observations:

"Until lately the jobber and the lumber merchants were the only ones to be consulted in the marketing and selling of the lumber product. This individual, as already mentioned, had become largely a manufacturer, and the time has now come when we should fix a fair and reasonable price for our yellow-pine lumber in all markets, governed only by its just merits in competition with other woods used for like purposes. There is no competition at anywhere near present prices except among ourselves. The lumber should go to the retailer at certain just and fixed prices."

In 1905, at the July meeting, when the committee report on values was before the house, the following, among other remarks, were made:

"Mr. White: The Committee on Values met and reported an advance in prices, on account of the pressure brought to bear by a large number here who are not on that committee. When it came to a question of voting on the price list it looked to me as though the

committee voted very enthusiastically, but not so very many 'ayes' from the back of the hall. It has been customary to inquire how many propose to issue the list; we want to see how it strikes every one, and would suggest that the chair call for a rising vote of those who are willing to issue the list, and separately of those who use the list as a basis for their prices.''

Twenty-two responded that they would issue the list and nine that they would not issue it, but would use it as a basis.

''S. H. Fullerton: I think the issuing of this list should be universal. I think the time is ripe to get the prices. We have said what the stuff is worth. Every one should issue the list; it causes a great deal of confusion when all do not do it. I would like to see everybody issue the list. It is due to the trade. If the prices are not legitimate and equitable, let them stand up and say so now. There is no use in entering into this thing in a half-hearted way. Let us go out of this room feeling that we are all going to do the same thing. If anyone feels that the prices are too high, let him say so now. It is not too late to rectify them. Let them stand up and be a man. We want uniformity of prices.''

''J. A. Freeman: I am glad to hear that we have such an urgent appeal to stand by the prices. I did not myself vote that our company would issue the list, although we would base our prices on it.''

''S. H. Fullerton: The list should be uniform in adoption. There is coming a time when the orders will be coming in very rapidly, and we need a uniform schedule. The effect will be good upon the trade.''

''J. A. Freeman: I believe Mr. Fullerton is right. The uniform issue of a list would certainly be beneficial to the trade, and would not interfere with anyone who is going to ask fifty cents above the list.''

''C. S. Keith: What date does the list become effective?''

"The Chair:   The committee's report provides for the 19th."

At the January meeting, 1905, the Committee on Values reported:

"That while present conditions would warrant an advance in prices, it is thought best to reaffirm the January 10th list, with a view to early action toward an advance later on.   J. B. White, chairman."

The same was adopted on motion of J. A. Freeman.

In an address to the convention in January, 1904, Mr. J. B. White again said:

"There is nothing now in competition with yellow pine—we are simply in competition with ourselves. Let us get together, and any reasonable price will be sustained."

N. W. McLeod, upon the same occasion, said:

"There is this to say, however:   I am satisfied the trade of 1904 will be of good volume, and it rests with the producers themselves—and particularly with those of this association—as to how many bulwarks they shall throw about the trade to protect it from the folly of undue competition between the manufacturers themselves, for yellow pine has no competitor to fear in other wood."

Upon another occasion J. B. White sent a telegram to the association, as follows:

"Greetings to all.   Hold to the list.   We are advancing as follows:   All items above January 4th list."

In his evidence in this case S. H. Fullerton says:

"Well, I believe in higher prices.   I do not think that lumber is selling at anything like its value.   I am very well satisfied of that."

J. A. Freeman says:   "I think that about the only reasonable course in the matter of finish, for instance, in order to protect ourselves, would be to advance prices fifty cents every time we meet together; my motive in suggesting this is that there are certain people

who will always cut prices fifty cents, no matter what it is, so if we advance it each time, we may in time get the price up to its proper level."

In 1904 Mr. Freeman stated that he thought the adoption of the report of the committee would serve the best possible purpose. *The report was adopted.*

In January, 1905, the Committee on Values was made permanent and charged not only with the duty of carefully studying all market conditions and conditions of stock, but was also given authority to take such action to secure a curtailment of the manufactured product as seemed necessary when deemed needful by the committee. *Adopted.*

The price list, or so-called market report, was published and issued in various forms to the trade by the association and by the individual members. It was first issued as a flat-rate sheet, and published for the association by E. J. Schuster Printing Company, under the direction and supervision of George K. Smith, secretary. This was known as the association official price list. The addressograph department maintained by the association collected the names and addresses of all dealers in the trade territory to which from ten to forty-five cent freight rates were applicable, and had them arranged accordingly, and these extracts were addressed to each of these dealers through this agency. The association also issued a long-leaf F. O. B. list and a short-leaf F. O. B. list (distinctions growing out of different weights of different lumber) containing quotations for delivery at the mills, which were the same as the official flat-rate sheet less the freight. From 600 to 1500 each of these were mailed out each time a new list was issued by the association, and bearing the same date as the official list, and extracts therefrom.

Not only did the association order and print for its own use and circulation a great number of these lists in the various forms referred to, but the individual members of the association ordered and purchased

from the Lumberman Printing Company, upon their own account, or made special orders for the same through the association of many additional copies. These special orders of the individual members were under special covers which bore the name of the member for whom printed and the orders run ordinarily for from 25 to 200 copies, though in some instances exceeding that number. A number of these special covers were identified and introduced in evidence.

After George K. Smith undertook the preparation of the so-called market report in the place of the former Committee on Values and the Market Committee, he made his orders for a new price list or market report in writing, referring to the date of the last effective list at the time, and indicating such changes as he desired therein, giving the date which it should bear, to be issued upon and become effective; giving also the number to be printed and the number to be reserved for special covers. These orders were written upon stationery of the association, were signed by Smith as secretary. The printer, in complying with the order, used the old forms which were continuously kept in type, and would make only such changes thereon as were indicated in the order.

The Lumberman's Printing Company ceased the printing of the Price Current under that name for the association in December, 1905, and about the time of the alleged sale of the stock therein by Smith (which it will also be noted was about the time of the movement against the association by the State of Mississippi), Smith announced that the association was going out of the price list business, and that it was up to the Printing Company to print the Price Current in booklet form upon its own responsibility, under its own name from that time forward. Although George K. Smith announced that the association had gone out of the price list business in December, 1905, yet it appears from the record that he steadily continued the

publication of the official flat-rate sheets. On the 27th day of March, 1906, he issued the same on the twenty-three-cent basis. On the 18th of July, 1906, he again got out a twenty-three-cent flat-rate sheet and called it a market report. The Lumbermen's Printing Company, in the meantime, issued three price currents under its own name, one, of date March 2, 1906, and one of date March 28, 1906, and one of date July 18, 1906. These three were printed from association forms (it appearing that the forms were at all times the property of the association), and were compiled from association-form price lists and lists being made up by George K. Smith. The issue of March 2nd was upon the price list of the association handed the printer by Mr. Smith and other members of the association. The issue of March 28th was based upon list issued by Smith on March 27th and contained the same prices. The issue of July 18th was based on figures given by Smith—a market report being also issued by him upon that date. Subsequent to July 18, 1906, the Printing Company did not undertake or claim to issue a price current in its own name, but thereafter, and continuously to the time of the filing of this suit, printed the same under the name of the association, and took its orders, as hereinafter stated, from George K. Smith, secretary, issuing also the F. O. B. lists and the extracts from the market report for the addressograph.

Shortly afterwards, and doubtless in view of the fact of Schuster's publication, the association Market Committee of Thirty met in conference with the board of directors of the association, and the board authorized George K. Smith to take charge of the market report and price list matters, with the result that on the 10th day of November a new list was published through the Lumberman's Printing Company as formerly, and from such time forward price lists and market report publications were kept securely within

the control of the association—Mr. Schuster getting along the best he could.

## PRICES.

From 1896 to 1908 the increase in yellow-pine lumber prices had been approximately 100 per cent on various items; on some, more than 100 per cent; on some, a little less; and this in spite of the fact of vastly improved methods of manufacture during that period from former periods which tend in the aggregate to cheapen the cost of production, and demands for new uses which tended to lessen the waste of the native product. Certain portions of that period of time were characterized by great business activity in all lines, but not all. The prices of lumber may have received an impetus to some extent from the general activity of the country, in periods of active business, but in periods of general activity, lumber prices, with a few variations downward now and then, continued upon the whole to advance and grow higher. The prices named by the Prist List Committee and named in the printed market reports, *were usually boosting prices;* all the witnesses for the respondents agree upon that proposition, while the respondents themselves say that such prices were taken as a basis, and that they either sold at the same or at so much less, that is, in making a sale, their proposition would be that they would sell so much stuff at the market report of a certain date, or at so much off that report. The witnesses for the State testified that with the issuance of a market report the dealers had to pay the prices mentioned therein; if the new market report quoted advanced prices, the advanced prices had to be paid upon the market in order to get the material, and where material advances were made by the wholesalers, the retailers also had to advance the price on stocks on hand.

260 Mo.—17

### CURTAILMENT.

In the early part of 1904 a movement took form in the association looking to the curtailment of the production of yellow-pine lumber among members of the association. The reasons assigned for such action were based upon unsatisfactory conditions as to prices prevailing at that time among dealers. Prices at that time seemed to be upon the decline, and this was attributed to the fact of the large production of lumber. It was sought by concerted curtailment through the association to arrest this decline and make conditions more favorable for stable and advancing values. It seems as early as January of that year the secretary, George K. Smith, had become alarmed about the production and its consequent effect upon prices and called the association's attention thereto at the January meeting of that year. As early as March of that year an attempt seems to have been made to regulate the amount of production by united action, but the required number to make the undertaking feasible failed to enlist.

At the semi-annual meeting of June, 1904, which was held at St. Louis, Missouri, the secretary, George K. Smith, made his official report to the association in which he called attention to the excess in amounts of lumber being manufactured in excess of sales, and the excess in amount of stocks on hand June 1st over the amount of the same on hand June 1, 1904, and other matters.

### PRESIDENT LONG'S ADDRESS, JANUARY, 1904, MEETING.

Mr. Long, in depicting the situation at that time, among other things, said:

"To obtain full advantage of these favorable conditions, it will be necessary to obviate ruinous compe-

tition. Some of our members lose sight of the fact that reducing sales below the market, manipulating of grades, special terms and special arrangements, all actuated by selfish motives, while possibly of temporary advantage to the offender, always react, and are the direct cause of our product for the year being sold below the values justified by the law of supply and demand.''

Captain J. B. White, at this January meeting, delivered an address before the association, entitled ''Marketing of Yellow Pine,'' in which, among other things, he said:

''A certain large eastern jobber of yellow pine, whom we all here well know, and who has lately become a manufacturer, said to me the other day that he could name fifteen men in the south, who, if they could agree, could fix and maintain a uniform price for yellow pine in all the markets of the United States. I asked him who they were. He wrote down the names, and I believe he is right. There is no wood that will take the place of yellow pine at anywhere near its present value. Let us think the subject over. It is worthy of our prompt consideration. There are a great many here to-day at this meeting, but when you come to look us all up and see who the men are who have the large control of all these different interests, we may be surprised to discover how large a part of the manufacturing interests here represented are really controlled by less than fifteen men, and if this is true, as I believe it, how close we may be to the final curing of the ills with which we have been afflicted.''

The result was that at its semi-annual meeting in June, 1904, the association in executive meeting, adopted a resolution favoring the curtailment of thirty-three and one-third per cent in the amount of lumber being manufactured by the various mills for a period of ninety days beginning with July 1, 1904. The meet-

ing was well attended, a list of those in attendance being found in the record.

George K. Smith, secretary, sent out to the various members and others copies of the curtailment resolution with the request that he be advised of their intentions as to observing it. A great number of the members acted in accordance with the resolution and curtailed the amount of the product manufactured. Secretary Smith's official report to the January meeting, 1905, and President Long's address both show this indubitably. The secretary called for and received reports from the mills as to facts showing whether they were complying or not, and received reports about every thirty days, showing the amount of lumber being cut and the stocks on hand, etc. At the end of the first ninety days, the second period of ninety days was recommended with like results.

The involuntary curtailment during the period of six months from July 1, 1904, to January 1, 1905, that is, curtailment by reason of accidents or other matters, which rendered it impossible to operate mills for certain days or times, amounted to 186,429,828 feet, while the voluntary curtailment for the same period of time amounted to 457,400,502 feet, making a total curtailment during the period of 643,830,330 feet.

Secretary Smith, in his official report to the January, 1905, association, calls attention to the fact that seventy per cent of the output had been curtailed thirty-three and one-third per cent, and submitted the result of his clearing house and other reports from members and manufacturers showing the amount of curtailment by months beginning with July and ending with December, 1904, and also the amount of curtailment during that period by States and the number of mills in each State curtailing.

There was less stock out during the year of 1904 than had been cut during the year 1903, more shipped during the year 1904 than in 1903, and less stock on

hand January 1, 1905, than was on hand January 1, 1904. In less than ten days from the first of July, after curtailment began, the downward tendency of prices had been stopped and within thirty days a substantial advance had been made. On October 15th another notable advance was made in prices. The advance between July 1st and October 1st was about $1.19 per M, while between October 1st and January 1, 1905, it was about $1.04 per M, or between July 1, 1904, and January 1, 1905, it was about $2.23 per M. On January 10, 1905, the association Committee on Values again advanced the prices.

The profits of the Long-Bell Company for the six months' period by reason of the curtailment was $260,381. It was estimated for all lumber manfacturers in the district for the same period there was an increase in profits of $6,298,500. To members of the association during the same period about $2,210,000. President Long, in his annual address to the association for the year 1905, reviewed the experiences of 1903 and the conditions of the first six months of 1904, and then took up the question of the curtailment matter and its results, and said in part as follows:

"And so at our semi-annual meeting in June a resolution was passed looking to the reduction of our output about thirty-three and one-third per cent. Some claim that the operation of this association costs too much money. Doubtless it is true that many stay out of it because of the cost it will be to them. I stated a few moments ago that this organization was organized in the year 1892 or fifteen years ago. The total cost to operate the same during its entire existence has been in round numbers $225,000; these figures are obtained from Secretary Smith's records. The members of our association, when running regular time, manufacture about 250,000,000 feet a month. On two-thirds time would mean 166,000,000 feet. According to these figures we shipped during the three months

from July to September, inclusive, 500,000,000, on which we received an advance of $1.17 per thousand, equal to $595,000. A like amount, viz., 1,500,000 feet, October to December, inclusive, on which we received an advance over July 1st, prices of $2.23 per thousand, making $1,710,000.

"I believe it practically safe to calculate that had not this curtail movement been effected, prices would have receded at least fifty cents per thousand below those prevailing July 1st. Multiplying one billion feet by this amount, we have $500,000. Added to the $1,710,000, we have $2,210,000 saved to the members of our association in six months, or about ten times as much as the entire expense of this organization since its inception.

"Again complete statistics show that the mills within the range of the territory covered by this association manufacture about 8,500,000,000 feet of lumber annually. Reducing this one-third will give us 5,700,000,000 feet annually. One-fourth every three months would give 1,425,000,000 feet. Multiplied by the advance between July 1st to October 1st, we have about $1,695,750; a like amount shipped between October 1st and January 1st at $2.23, equal to $3,177,750; estimating that prices would have declined at least fifty cents per thousand below those prevailing July 1st, would mean on 2,850,000,000 feet $1,425,000, or a total saving to the entire manufacturing fraternity in the district in question $6,298,500.

"Very unexpectedly, but true, we found that one of our mills manufactured its lumber during this curtail movement at seventeen cents per thousand cheaper than the first six months of the year under like conditions as to expenditures, etc. Another, $1.64. This mill, however, was a new mill, and doubtless part of this saving is accounted for by the same being in smoother running shape the last six months than during the first six months. Another produced its lum-

ber at twenty cents less under the curtail plan. Another, and the last, cost thirty-three cents more during the last six months than the first six.

"I wish you would individually make a reckoning of what this curtail movement means to you, for by this means the illustration I think will be more forcible. Some two years ago, in figuring up and finding that the cost to my company and its allied interests to operate this association was about $2500 per year (and I must admit that I thought it looked large) yet in making my calculation as to the saving that this curtail movement has effected to my company, and finding that we obtained about $145,081 more for our shipments between July 1st and January 1st than we would have obtained at prices prevailing July 1st, and that our stock on hand at our mills and in our retail yards was worth about $115,000 more than it would have been worth January 1st in the absence of this movement, *making a total saving for this company of* $260,380, the $2500, of course, sinks into an insignificant pebble.

"To me, our ability to bring so large a number of minds together to such an extent as to work to the same end, is of more satisfaction than the money thus far obtained by this action, for it overthrows the idea often expressed that there are too many different interests involved to affect prices when the manufacturing capacity, or supply, is in excess of the demands of the trade.

"I believe that the working of this curtail movement will give us more confidence in ourselves, more confidence in each other, and should we, as we will, reach a condition sometime in the future where our supply will exceed the demand, this experience will prove of immense value, and just in this connection preparatory to such a condition, I would recommend that a committee consisting of two from each district covered by this association be appointed, and made a permanent committee on curtailment, in whose hands

shall be lodged power to restrict the output when in their opinion conditions demand."

This address was referred to a committee for such recommendation as it might see fit to make concerning it. In due time this committee reported back to the association as follows:

"We recommend to all our members a most careful study of all the suggestions so ably presented. Recognizing the great victory gained by our late efforts at curtailment, we offer the following:

" 'Resolved, that there shall be a permanent committee on values appointed. In addition to former work of said committee, it shall be their duty to appoint from their own number, a select committee of five, who shall be charged with carefully studying all market conditions and conditions of stock, and who shall in event of apparent necessity, take such action to secure further curtailment as they may deem needful."

This report was adopted.

Not only did prices advance during the curtailment period, but they continued to advance for sometime afterwards. A new price list was issued the 10th of January, 1905, and the Association Committee on Values a few days afterwards reported that they would make no changes in the same, but reaffirm the same with a view of early action towards an advance later on. *They did issue a new list in March, 1905, and again in May, July, August, November and December, each list showing an additional advance over the last previous one. Four new ones were issued in 1906, nine in 1907, and three in 1908, to the time of the institution of this suit.* Prices advanced from August, 1904, to May, 1908, on some items as high as $12 per thousand.

In the early part of 1905 continued curtailment took place in the production of lumber, being involuntary, however, on account of weather conditions. The amount, however, was such as to render any voluntary.

curtailment unnecessary in order to give the associa tion the proper grip on prices. The amount of curtailment for the first six months was over thirty-three per cent again. Prices continued to hold and advance until in the latter part of 1907, when it appears that there was a great curtailment among the mills. In the month of November for that year a curtailment of 203,000,000 feet was reported by 328 mills; while in the month of December, from 420 mills reporting, in territory covered by the association membership, there was found a curtailment of 309,000,000 feet. In October, a circular letter had been issued to the manufacturers calling attention to the condition of stocks, suggesting that it was time to "stop, look and listen." By the middle of November following, a mass meeting of yellow-pine manufacturers was held at Memphis and reports as to the running times of various sawmills were called for and also as to the amount of lumber being produced and the curtailment above referred to followed. In his January, 1908, report Secretary Smith said:

"In closing my report one year ago this sentence was used: 'Unless something unforeseen happens to prevent, we should move forward during 1907 with increasing members and increased benefits to every member.' As you all know, something happened late in October which put the brakes on suddenly, and the effect will be noted in our figures on production, as well as in the curtail of the association and the income account. Many will remember a circular issued on October 3rd, calling attention to condition of stocks at that time which would cause manufacturers to 'stop, look and listen.' Since that time, owing to financial stringency, there has been a marked reduction in production.

"At a mass meeting held in Memphis on November 14th, a suggestion was made that the running time of sawmills be secured with a statement as to any de-

State ex inf. v. Arkansas Lumber Co.

crease or increase of production. From actual reports sent in, the reduction in production during November among 328 mills was 203,000,000 feet; among 420 mills in December, 309,000,000 feet, and among 266 mills in January will be 273,000,000 feet. Using these figures as a basis, it is reasonable to count on a reduction in our output between November 1, 1907, and January 1, 1908, of one billion feet, or forty-four per cent in the States covered by our membership. The effect on stocks will be shown later. Calls for running time of sawmills will be made monthly until conditions change."

The downward tendency in prices starting in about that time was arrested at once and on some items immediate advances were made.

Some of the respondents filed on June 10, 1912, a motion to require relator to elect upon which of three charges, to-wit, membership in and alleged acts as members of the Southwestern Lumbermen's Retail Association; membership in and alleged acts as members of the Yellow Pine Association, and acts in connection with the Joint Trade Relations Agreement, the relator would proceed.

The commissioner found guilty all of the respondents whose names, domicile and connections with the Yellow Pine Association we have set out above herein. Generally his findings are these:

"In view of the record there could be no question but what it was for the purpose and intention by the use of the price list and by the curtailment processes and other methods and processes employed, singly and separately by each, and also the one in connection with the other, to fix, regulate, maintain and advance prices of yellow-pine lumber upon the market in Missouri. Not only did the association and its members pursue policies peculiar to the association for the purpose of affecting and controlling the prices of lumber, but it co-operated with the Southwestern Lumber-

man's Association and with other associations of a similar character, methods and work, which had as a result the limiting of competition in the trade and the control of the trade with all that that might mean. It entered into an agreement with the Lumber Secretaries Bureau of Information in which was federated the great retail lumber companies covering the territory of its operations, manufacturers and wholesalers, which was in its essence unlawful and tended to restrict trade and limit it to certain channels and give the control thereof into certain hands and thereby make it the easier to regulate the quantity or amount of lumber manufactured and sold and the price to be had and obtained therefor.''

Specifically, and touching the provisions of our anti-trust statutes and the phases thereof which the commissioner deemed to have been violated, he finds:

''It is further found that the Yellow Pine Association is an unlawful pool, trust, agreement, combination, confederation, arrangement and undertaking, created, entered into and maintained by respondents and others with the unlawful design, purpose and view of limiting, controlling and fixing the price to be paid by retail dealers in lumber and consumers of lumber in the State for lumber offered for sale and sold herein and to maintain such price when so regulated and fixed; to regulate, fix and limit the amount and quantity of lumber manufactured and bought and sold in this State; to control and limit the trade in lumber and to limit competition in such lumber trade in Missouri; and that the respondents and each and everyone of them, as members of said association, have, through said association, pool, arrangement and undertaking, and by means of its practices and policies, regulated and limited the amount and quantity of lumber manufactured and sold in Missouri; have increased, fixed and maintained the market price of lumber bought and sold in this State; have lessened lawful trade and full

and free competition in the manufacture, importation and sale of lumber in this State, and were at the time of the institution of this suit unlawfully and illegally fixing and maintaining the price of lumber in the State and restraining full and free competition in the importation and manufacture and sale of lumber in this State, and that by means thereof respondents have violated the said statute law of the State of Missouri upon which the information is based, and have incurred all the penalties therefor as provided in said statutes.''

Thereupon, and within the time provided by the order, respondents filed with this court seventy-two exceptions, and the case is before us for our ruling as to whether in the last analysis—and for naught else of legal substance—there is law and evidence in the whole case justifying us in granting the prayer of the relator, or whether respondents should go hence acquit. So, since there is no point to be subserved by a lengthy separate review and discussion of the whole of these seventy-two exceptions, we shall not take them up *seriatim,* but discuss and rule such vital points as may serve to elucidate the one question in the case.

We have drawn largely upon the most excellent and scholarly report of the able commissioner for the facts of this statement, and also for the language thereof, which for the most part is *verbatim.* This acknowledgment is in lieu of quotation marks.

## OPINION.

I. Many contentions have been lodged with us by the many learned counsel who, representing the different respondents, have filed briefs or made oral arguments in this court. All of these contentions, however, in the last analysis, we think may be fairly embraced in the epitome thereof which we make below:

(a) That the petition filed by relator herein does not state facts sufficient to constitute a cause of action

against any of the respondents; (b) that there is a mis-joinder of causes of action, or alleged causes of action, against the several respondents; (c) that respondents are, by law, and by the constitutional guaranty, enti-tled to a jury trial; (d) that the three-year Statute of Limitations, as a question of law, applies, under the facts, to the alleged acts of respondents, and that thus applying such statute respondents should go acquit upon the evidence; and (e) that upon the law and the evidence as shown by the record, the finding of this court should be for respondents and against the State. Thus far in their contentions all of the respondents agree, and thus do they each contend. In addition, some of the respondents herein, further contend (1) that this court has no jurisdiction in this case for the reason that the statutes under which the prosecution is had, are, and each of them is, violative of the In-terstate Commerce Law, and that therefore they in-fringe upon the rights given by the Constitution of the United States to the Congress; that (2) sections 10310, 10312 and 10304, Revised Statutes 1909, are, and each of them is, unconstitutional.

Many other points are urged, but all of them, in our view, can be included in the contention (e) above urged. Practically all of the exceptions filed in this court to the report of the commissioner may be dis-posed of within the compass of this point. In order to reasonably preserve the logic of this discussion, we here shall make, touching the case, some preliminary observations.

It is clear that if we should hold in the end that under the law, the duty of passing both upon the law and the evidence devolves upon this court, then the question of the refusal by the commissioner of certain declarations of law requested; the giving by the com-missioner of other declarations; the findings of fact and the conclusions of law made by the commissioner, and the alleged admission of incompetent evidence

offered by the State, all fall out of this case. Likewise, owing to inherent limitations of conditions precedent to a review, hereafter to be noticed, errors bottomed on the *refusal to admit* competent testimony, fall out of the case.

The Constitution has vested in this court original jurisdiction for hearing and determining proceedings by *quo warranto,* or as this court has construed the language of the Constitution, "informations in the nature of *quo warranto.*" [State ex inf. Walker v. Equitable Loan & Inv. Assn., 142 Mo. 325.] Whether originally there was in the minds of the makers of the Constitution the intention that questions of fact should be heard in this court in matters wherein it has original jurisdiction, upon oral testimony, as in the courts *nisi,* we need not here discuss. Whatever the intention may have been, the practice is now well-settled in this court that in original proceedings in which questions of fact arise necessitating the introduction of evidence in proof or disproof thereof, this court will appoint as an aid thereof, some learned lawyer of this State to take the testimony. The status of this commissioner, as he has come to be named, as an arm of the court, has never been clearly and definitely determined by any judicial holding. To an extent, the duties of such a commissioner seem to be *sui generis.* Usually and in substance, the orders made by this court appointing such commissioners, have been that "such commissioner shall have the power and authority and be subject to the same duties and obligations as are by law conferred and imposed upon officers authorized to take depositions, and in addition to the power and authority aforesaid, said commissioner shall have power and authority to hear and determine all objections to testimony, and to admit or exclude the same in the same manner and to the same extent as this court might in a trial of this cause before this court; *all rulings of such commissioner to be subject, however,*

*to review in this court,* at or before the final hearing of this cause upon exceptions by either party.''

The rule stated by Finkelnburg and Williams on Mo. App. Prac., 194, is as follows:

''It is usual to have the testimony taken by a commissioner appointed for that purpose with power to rule on questions of evidence, subject to review by the court itself.''

Upon the latter rule, or upon the above order, the apparently conclusive power conferred on the commissioner is, it is clear, a naked and useless one.

In the case at bar, our commissioner, by an order of this court made in that behalf, was empowered to ''take the testimony upon the issues joined in said cause, with full power and authority to issue subpoenas, compel the attendance of witnesses, and the production of papers, books and other documents, to issue attachments therefor, and to hear and determine all objections to testimony, and to admit or exclude the same in the same manner and to the same extent as this court might do in the trial of the case before the court, and to report the testimony with his findings of fact thereon, together with his findings as to the law upon each issue tendered to him by the respective parties, and to state his conclusions of law in his final report, exceptions to the findings of fact and law so made by said special commissioner, to be filed by either party so desiring, within ten days after the filing of the special commissioner's report and findings.''

There is no statute nor are there any constitutional provisions defining the effect and binding force of the findings of such commissioner upon the law or the facts. How far, if at all, is this court bound by such findings? There are constitutional objections to the power of this court to delegate any of the duties conferred upon it by law or by the Constitution. The practice of thus designating some attorney to take the testimony in an original proceeding and return the

same to this court, arises from the necessity of the
case, without the protecting authority of either Con-
stitution or statute, except as to writs of prohibition,
by a comparatively recent statute. [Laws 1895, sec. 6,
p. 95.]   The power to pass upon the admission or non-
admission of testimony as a finality would carry with
it, to an extent at least, some appreciable portion of
a delegated judicial authority.   The power of a trial
court or a court of general jurisdiction—as for exam-
ple our circuit courts—to appoint referees, is espe-
cially conferred by statute.   Such references are rec-
ognized statutory arms of the circuit court, to be used
in certain cases and under certain conditions.   No such
authority to delegate any of its judicial powers as we
have seen, having been conferred upon this court,
either by the organic law or by statute, and such dele-
gation of the full power to bind and loose being in our
view unwarranted, we see no escape from the conclu-
sion that a commissioner appointed by this court to
take testimony in an original proceeding has but the
bare authority of a special commissioner appointed to
take depositions and return them into court.   His find-
ings upon the facts would be persuasive, and not bind-
ing on this court; his conclusions upon the law like-
wise might be persuasive, as might be the suggestions
of a friend to the court, but not binding.   Any other
view would eventually lead us into conflict with the
law and the Constitution.   This view, when compared
with the earlier forms of orders made in these cases,
seems to be in consonance therewith.   Latterly, the
orders made in these cases would seem, by their terms,
to attempt to broaden the original power conferred
upon such commissioners.   Such broadening cannot, in
our view, be upheld under the law or under the organic
law.   Any other view inevitably leads us into logic-
closed lanes and brings about impracticable if not ab-
surd situations in practice.   If the commissioner on
a hearing had   erred in refusing to admit evidence

State ex inf. v. Arkansas Lumber Co.

which is competent and vitally material, and which he ought to have admitted, so as to enable us to pass on the case legally, fairly, intelligently, what are we to do with the case when we convict him of error? Clearly we may not do the useless thing of sending the case back to him, only that the error may be corrected. No good would be thus subserved, except to confer a debatable personal favor upon the commissioner, in that we would confront him with his own error, without perhaps convincing him that he had erred. If he err by admitting evidence that he ought not to admit, the same thing is true. We have the matter before us and may correct this error. In neither contingency does good accrue, nor is the case expedited by conferring upon the commissioner the power to bind and loose in his rulings upon the facts or the law. If we may confer so thorough-going a power upon a commissioner, there is left to us but the clerical labor of entering the decrees of our Frankenstein. Such a view contributes but little to brevity of record or simplicity of procedure, because in practice upon exceptions made the case comes up to us with the offerings bodily in the record for our review, just as if in all cases, the commissioner had admitted it originally, or just as if he had not *excluded* it. In the last analysis, in no case and in no event, as we have seen, does the ruling of the commissioner conclude either party or this court, since either party may review his rulings by exceptions. So the commissioner does not in fact have the power to "admit or to exclude testimony in the same manner and to the same extent as this court might in a trial before the court," the order to the contrary notwithstanding. Except in so far as it may stimulate counsel to plant objections and exceptions like danger-signals thickly through the hearing, and to obviate the labor of reviewing all such not brought here by formal exceptions, such verbiage in

an order serves no practical purpose. We find no fault with it, however, but are merely discussing it *arguendo* to determine, if we may, its legal effect.

If we consider the commissioner as occupying the status of a statutory referee and as possessing all of the powers, duties and prerogatives of such, we yet reach the identical conclusion, though we come to it by a different road. For in equity cases the court is not bound by the findings of a referee upon the facts. [O'Neill v. Capelle, 62 Mo. 202.] This is the rule likewise in all cases which are compulsorily referable under our statute. [Utley v. Hill, 155 Mo. 232; Haas v. Garnett, 155 Mo. 568; Reed v. Young, 248 Mo. l. c. 612.] Likewise the rule as to the force and effect of the reports of masters in chancery, is in consonance with this view in such a case as this. Where a case under the old equity practice was referred to a master by consent, then the findings of the latter were like special verdicts of a jury, or like the report of a referee, would be in the same case, but where the case was sent to the master without the consent of both parties, the master's findings of fact were advisory to the court only. [Hapgood v. Berry, 157 Fed. 807; Kimberly v. Arms, 129 U. S. 512.] So whether we view the commissioner as an arm of this court *sui generis,* whose functions have arisen *ex necessitate,* or whether we weigh him in the scales by which we weigh a referee, or a master in chancery, we reach the same conclusion, as to our right here to review his findings.

Taking these views as to the powers and duties of the commissioner, it will be seen that all of the rulings made by him upon the law and the evidence, as also the findings made by him upon the facts, are subject to complete, full and ample review by this court upon exceptions *timely* filed thereto by either party. This being the case the contentions and exceptions urged by the respondents, other than those of cold law and fact mentioned above, fall out of the case. The case

is here for our weighing upon the law and for·our examination upon the evidence as we may find it to be from the record, reserving the right to be persuaded, if we be so inclined, by the learned commissioner's finding upon the facts, and to be swayed, if we deem his position sound, by his conclusions upon the law.

II. Respondents each and all contend that they were entitled to a jury trial. Upon this contention they cite authorities from other jurisdictions, which in the main, support their contentions. However that may be, the rule by weight of authority in this State is otherwise. This holding has never been departed from in this State except by inference, as we might say, in the Townsley case, infra, since the question was first raised as reported in the case of State ex rel. v. Vail, 53 Mo. 97. The doctrine enunciated in the case of State ex rel. v. Vail, supra, was affirmed in the case of State ex rel. Norton v. Lupton, 64 Mo. 415, and in divers other cases not necessary to mention. The alleged right to a jury trial was futilely urged in the case of State ex inf. v. Standard Oil Co., 218 Mo. 1, in this court, and the point was kept alive and again urged in the Supreme Court of the United States in the case of Standard Oil Co. v. Missouri, 224 U. S. 270; and while there is some authority in other States which bears out the contentions of respondents touching this right to have questions of fact determined by a jury, yet our courts hold by the weight of authority to the contrary. Besides, the request for a jury in this case was not raised by respondents in a timely way. With full knowledge, presumably, of the limitations, if not impossibilities by which this court is hedged about in the trial of questions of fact, and with full knowledge of the practice and procedure in this behalf, respondents made no request for a jury till the matter of taking testimony came up before the commissioner appointed by this court. There for the first time a de-

mand for a jury was urged—urged too before an arm of this court, having, as respondents well knew, no power to call a jury or to try a case by a jury. There is but one case in this State where a jury was ordered in a *quo warranto* proceeding; that is the case of State ex rel. v. Townsley, 56 Mo. 107, where, timely request having been made to this court to submit the question of fact to a jury, this court ordered the case referred to the circuit court of Jackson county for a hearing. Likewise in an early Michigan case, a similar procedure seems to have been had. [People ex rel. v. Doesburg, 16 Mich. 133.] And in Oklahoma, it is said that the constitutional right to a jury exists, but if a jury is demanded in a case in the Supreme Court where no machinery therefor has been by law provided, the case will be dismissed and brought in a court having power to call a jury. [State ex rel. v. Cobb, 24 Okla. 662.] So, even if it were not now the well-settled law of this State—weight of *stare decisis* regarded—that a jury trial will not be granted by this court in a *quo warranto* proceeding here, we would yet hold that under the facts here respondents, by their failure to request a jury in a timely way, must be said to have waived trial by a jury, even if they were entitled thereto under the law.

Persuasive with us in this view is the law on the same point as to a referee, wherein the practice in many respects is cognate. As to the time of demanding a jury in a referred case this court said in Smith v. Baer, 166 Mo. l. c. 402:

"But even if the question was open to review, there is no merit in the claim. The motion came too late. The right should have been asserted before the case was referred. A party cannot take chances of winning before a referee, and when he fails, demand a jury trial in the circuit court after the referee's report is filed. [Young v. Powell, 87 Mo. l. c. 130.]"

There are, it is conceded, minor points of difference between the facts in the instant case and those from which the above excerpt is taken (compare, Laws 1895, section 6, p. 95), but in all civil cases the rule is similar. In civil cases, says Cyc., a jury must be demanded or the right of trial thereby will be waived. [24 Cyc. 161.] Such demand must be timely (24 Cyc. 165), regard being had to the loss of time and labor, and the expense incident to failure to make a timely request.

The personal views of the writer are that present a timely request for a jury in the trial of an information in the nature of *quo warranto*, having for its object the forfeiture of the franchise or the confiscation of the whole or a part of the property of a corporation, such request ought to be granted, and the case sent down to a circuit court (compare Sec. 6, p. 95, Laws 1895; Sec. 2627, R. S. 1909) to be tried by a jury on issues of fact framed by this court. [State ex rel. v. Townsley, supra; People ex rel. v. Doesburg, supra; State ex rel. v. Cobb, supra.] However, I have found the great weight of the decided cases in this State to hold to the contrary. In fact, none holds with these views, save and except the Townsley case, which, remarkable to say, has never yet been expressly overruled. Nevertheless, the writer at this time, in this case, absent diligence as pointed out, and to say no more, present perhaps, at least a modicum of technicality, does not feel inclined to argue or to urge the overruling of the cases expressing a doctrine on this point contrary to his own personal views.

III. All of the respondents contend that the petition in this case does not state sufficient facts to constitute a cause of action against respondents or any of them, and that there is an unwarranted and illegal misjoinder of respondents therein. Coming to the last clause of respondents' contentions first, it is clear that

the petition seeks to charge an unlawful combination, or confederation, or in other words, a conspiracy. It is common sense, as well as law, that in order to constitute a conspiracy there must be conspirators. The respondents in a sense are, and each of them is, charged with conspiring together, each with the other, and all with all to do certain things made unlawful by our statutes leveled against pools, trusts and combinations. In the very nature of things, it was clearly impossible to charge them at all unless they were charged, as they were, together. If respondents' contention be bottomed upon the fact that the Badger Lumber Company, Missouri Tie & Timber Company, and others, who upon taking proof satisfied the Attorney-General that they were not and had not been members of the association complained of, and were dismissed hence, then the dismissal by the State as to these respondents relieves us from further discussion of this point, since nothing is clearer than that respondents' case is not, has not been, and cannot be prejudiced by the joinder for a time with them, of other respondents, as to whom, no guilt being found by counsel for the State, the case has been dismissed. Besides our statute, by which now alone demurrers are weighed, requires that the demurrable defect of a defendant's not being a necessary party to the determination of the action, "shall appear upon the face" of the petition (Sec. 1800, R. S. 1909), *as the latter defect did not* in the instant case.

Coming to the question of whether, regardless of the contention last above disposed of, the petition states such facts as to constitute a cause of action against respondents, we are met with a more serious difficulty. We have a statute which provides that in any action brought to enforce the anti-trust laws it shall not be necessary to plead "the manner in which, or when or where" such conspiracy was made or effected. [Sec. 10310, R. S. 1909; Laws 1907, p. 377.]

This form of action, that is to say, an information in the nature of *quo warranto,* has been held to be a civil action. That it is a civil action is now the well-settled law of this State. But to the aid of the rules of pleading in ordinary cases, the Legislature has sought to bring section 10310, supra. Regardless, however, of the provisions of this section, this court, in the case of State ex rel. v. Missouri Pacific Ry. Co., 240 Mo. 35, l. c. 48, lately held as follows:

"Since the well considered decision of this court in the case of State ex rel. v. Grimm, 220 Mo. 483, it has become the settled law of Missouri that in proceedings in the nature of *quo warranto* to. revoke the franchise of a corporation duly chartered or licensed to transact business in this State, the pleadings shall conform to our general Code of Civil Procedure.

"In the Grimm case, supra, this court, in Banc, speaking through GANTT, J., said: 'The decisions of this court have recognized the right of a defendant or respondent to demur to the information in the nature of *quo warranto,* and this doctrine is the prevalent one in other States, and is approved by the text-writers on the ground that it brings the pleadings and practice in these *quo warranto* cases in harmony with the practice in other civil cases. . . . Whenever the information in *quo warranto* avers that the respondent has a corporate existence and the evident purpose of the proceedings is to have its charter forfeited for nonuser, misuser or usurpation of powers, then the pleader must plead *specifically* the acts of the non-user, the acts of misuser or of usurpation relied upon for grounds of forfeiture, so that the corporation may know what it is called upon. to meet and defend."

It is urged by learned counsel for respondents that the above case is decisive of their contentions upon this question in the instant case. Respondents, however, lose sight of the distinction which ought to be drawn under the law between the Missouri Pacific case,

supra, and the one at bar. In the Missouri Pacific case respondents were charged, in substance, with entering into an unlawful combination to do a lawful act; that is to say, an unlawful combination to fix a rate for carrying passengers not exceeding the statutory rate which they were permitted by law to charge. Since by statute they might charge a maximum rate of three cents per mile for carrying a passenger, and since even pursuant to the alleged unlawful conspiracy into which it was charged they had entered, they were not seeking or conspiring to charge a rate beyond the maximum rate allowed by statute; they were endeavoring only *to do a lawful act by an unlawful means.* This distinction is clearly drawn in the Standard Oil case, supra, at page 366, where it is said:

"And especially is this rule applicable in this State when such proceedings are civil in their nature; and which are not required to be stated with the same technical strictness with which crimes must be charged. [State ex inf. v. Equitable Loan & Inv. Co., 142 Mo. 325; State ex inf. v. Delmar Jockey Club, 200 Mo. 34.] But waiving that point for the present and conceding that this proceeding is in the nature of a criminal prosecution, and that the pleader should be held to the same strict rules of pleading as is required in charging a criminal conspiracy, still we are of the opinion that the information states a good cause of action, for the reason that acts with which the respondents are charged are unlawful.

"In such cases the rule is, that, 'If the act which the conspirators combine to perform is unlawful, it is unnecessary to set out in the indictment the means employed in accomplishing it. But if the end in view is lawful or indifferent, and the conspiracy only becomes criminal by reason of the unlawful means whereby it is to be accomplished, it becomes necessary to show the criminality by setting out such unlawful

means.'   [4 Ency. Pl. and Pr., pp. 713, 714, 716, 717; Coal Co. v. People, 214 Ill. 421.]''

A similar attack was made by the respondents in the Standard Oil case, supra, to the petition there.   It was held by this court that the petition was good·under the rule above enunciated.   It was held·on the other hand that the petition in the Missouri Pacific case, supra, was bad.   [State ex rel. v. Missouri Pacific Ry. Co., 240 Mo. 35.]   The Standard Oil case was rightly decided; the Missouri Pacific case was rightly decided; but the distinction which we make here was, by inadvertence, not carefully drawn as between the.two cases. The Standard Oil case, supra, was a conspiracy to do an unlawful act by an unlawful means; a conspiracy to do a thing against which the statute is leveled, and governing which the provisions of section 10310, supra, apply; while the Missouri Pacific case was a conspiracy to do a lawful act by unlawful means.   In other words, there were present in the Standard Oil case both a conspiracy and an unlawful act; while in the Missouri Pacific case there was present (or charged) a conspiracy only.   The Missouri Pacific Railroad Company might (then) have lawfully charged three cents a mile for carrying a passenger, but it could not (then) lawfully agree to stifle competition by contracting with other common carriers to make or fix an agreed rate, even though such agreed rate was less than the three cents allowed by law to be charged. (Query: Has not competition been since "repealed?") In the case at bar both a conspiracy and an unlawful act is charged.   This case falls within the category and is to be judged, it would seem, by the rules of pleading fixed by the Standard Oil case and not by those of the Missouri Pacific case.   Regardless of this, however, respondents by answering over waived this point, however good it might have been had they taken timely advantage of it.   They all and each of them answered here in this court before the case was sent to our com-

missioner for the taking of testimony therein; a majority of them filed in this court amended answers before the case left here, and yet others and the remainder of them lodged amended answers with the commissioner, with the privilege of having such answers referred back to this court for permission to formally file the same. At least seventeen of the respondents thus lodged with the commissioner such amended answers on June 10, 1912, long after they had interposed their said demurrers *ore tenus*.

That the petition in this case, viewed by the ordinary rules of pleading, was vague, uncertain and indefinite, there can be no doubt; it is patent that it does not inform respondents definitely of the things which it is charged they have done; of the definite unlawful acts which it is charged they have committed; it does not say how or when or where such acts were committed. It gives to the State a roving commission to rake dead coals from time to eternity, from center to circumference; but yet after all and in all, viewed in the light of our anti-trust law, it directly charges a violation of that law in the language of the law; it is only uncertain and indefinite as to time and place and circumstances; it states a cause of action by pleading legal conclusions, but it does not state it with the art or with that definiteness which respondents and this court, that time and labor may be saved and business may be expedited, were entitled to have it stated. A motion to make more definite and certain would have lain, and a timely demurrer for defects in this behalf ought to have been sustained, and most probably would have been sustained had such demurrer been filed in a timely way. But it was too late to urge the same before the commissioner. No demurrer to the petition has ever been filed. The only demurrer offered was a demurrer *ore tenus,* objecting *in limine,* because the petition, as respondents averred, stated no cause of action. Such a demurrer has never been regarded by

this court as reaching the alleged defects in a petition to nearly the same extent and for even nearly the same purpose as the formal written demurrer provided for by our code of pleading. Such demurrer, that is a demurrer *ore tenus,* in law has no more effect in reaching a bad petition than has a motion in arrest, which to an extent is covered fully by our statute of jeofails. *Such demurrer will not reach mere uncertainty or indefiniteness of averment, or the defect of pleading legal conclusions.* [31 Cyc. 761, and cases cited.]

If a petition attacked for insufficiency by an objection to the offering of any testimony thereon, may be held by liberal construction and reasonable intendment to state a cause of action, we ought not to lend our encouragement to a method of attack which smacks of the ambuscade, and of a digging of pitfalls for the feet of the unwary. [Heether v. Huntsville, 121 Mo. App. 495; Haseltine v. Smith, 154 Mo. 404; 31 Cyc. 761.] *A fortiori,* we ought not to do so in an age when the question is up for serious debate among Bench and Bar as to whether the demurrer ought not to be abolished, for that it is an anachronism and has outgrown its usefulness, and especially in a case which has been pending and dragging its slow length along for more than five years; in which many thousands of pages of testimony have been taken, and the trial of which has involved years of time, manifold labor on court, counsel and commissioner, and thousands of dollars in expenses and costs.

We hold the petition good under the law here, having regard to the time and manner of the attack thereon. Reaching this view by another road, we need not pass upon section 10310, and say how far, if at all, we are helped by it.

IV. It is urged by all of the respondents that the three-year Statute of Limitations applies in this case; that the State had no power or authority to go back

in its investigations and dig up the alleged illegal acts of respondents occurring at a period prior to July 30, 1905, which date was three years to a day prior to the institution of this action. In this view of respondents we concur. It is urged by the learned Attorney-General that section 1890, Revised Statutes 1909, of our Statutes of Limitations, does not apply. This section, in so far as its provisions are in anywise applicable to the facts here, is as follows:

"Sec. 1890. Within three years: . . . second, an action upon a statute for a penalty or forfeiture, *where the action is given to the party aggrieved,* or to such party and the State."

This question does not seem ever to have arisen in this State in a case of this sort. There have been cases adjudged in which the rights of towns and villages to exercise their corporate franchises were brought in question by informations in the nature of *quo warranto.* It has been held upon the doctrine of *laches,* however, that the right to investigate such matters is sometimes barred without regard to the Statute of Limitations. In one case it was held that a period of twelve years barred this right (State ex rel. v. Town of Westport, 116 Mo. 582); in another case it was held that eight years barred this right (State ex rel. v. Town of Mansfield, 99 Mo. App. 146). But these were cases where the State inquired, in effect, by what right the respondent cities exercised corporate privileges.

There is little, if any, similarity in fact between those proceedings and this at bar, *et id genus omne.* Scarcely a vestige remains but the name and we have uselessly and with violence retained this. We have reached out into common law without an excuse in the necessity of the case and appropriated merely a name for an action under penal statutes which themselves prescribed another and contemplated a different procedure. This action clearly involves the exaction of

a penalty or forfeiture.  [Northern Securities Co. v. United States, 193 U. S. 1. c. 358.]  The statute quoted limits the right of action to the *party aggrieved* to the period of three years.  The State is here the party aggrieved.  It is said and correctly said, that in the absence of a specific statute against the right of the State to maintain this action the law does not foreclose the State's right to institute the same, for the reason that no time runs against the State.  That this is the general law in other jurisdictions and the law everywhere, in the absence of a specific statute, we concede and do not doubt.  [Eel River R. R. Co. v. State ex rel., 155 Ind. 433; Crane v. Reeder, 21 Mich. 24; State v. Fleming, 19 Mo. 607; Bagley v. Wallace, 16 S. & R. (Pa.) 245; Lawless v. Wright, 39 Tex. Civ. App. 26.]  *But we have here in this State a specific statute,* which is as follows:

"Sec. 1914.  The limitations prescribed in articles 8 and 9 of this chapter shall apply to actions brought in the name of this State, or for its benefit, in the same manner as to actions by private parties."

That this section makes applicable to the State every general limitation in our law there can be no doubt in logic or reason.  Section 1890, supra, the applicable part of which we quote above, is contained in and is a part of article 9 of chapter 21 of our Revised Statutes, and the section last read is also one of the sections of article 9.  Section 1914, supra, came into our law in substantially its present form by the Act of February 24, 1849.  For many years it was held to be a statute of limitations for the State as well as for the individual.  [Hendrickson v. Grable, 157 Mo. 42; Dice v. Hamilton, 178 Mo. 81.]  Prior to the enactment of section 1886, Revised Statutes 1909 (which section took effect August 1, 1866), it was held in this State that section 1914, supra, applied to the State in so far as to bar the State from the recovery of parts of the sixteenth section.  [Mississippi Co. v. Vowels,

101 Mo. 225.] In fact there seems to have been no change or shadow of turning in the holdings upon this point that this section does bar the State, regardless of the maxim *"Nullum tempus occurrit regi,"* whenever the facts bring the State within the verbiage of this section.

It occurs to us that some of the legal questions now being constantly raised—(some of which, namely, form of pleading, right to a jury and Statute of Limitations, are to the fore in the case at bar)—might be slightly illuminated by a bit of analysis of our statute against pools, trusts, and conspiracies. Going back to the Act of May 10, 1899 (Laws 1899, p. 316), for reasons hereafter appearing, we note that section one of this act is *in pari materia* with sections one, two and three of the Anti-Trust Act of the United States (26 Stat. at Large, 209) the so-called "Sherman Act," the fields of interstate and intrastate trade affected by them, respectively, being regarded. This similarity inheres, except that the Missouri law confines itself to a very specific definition of the offenses denounced, while the sections of the Sherman Act mentioned define the offense in general terms, and prescribe penalties for the punishment of the infraction thereof. Sections two, three and four of our Act of 1899 are *mutatis mutandis,* similar in all substance with sections four, five and seven of the Sherman Act. Section five of our Act of 1899 simply makes the provisions of the act cumulative in procedure and provisions with former acts, unless in case of irreconcilable conflict. Many of the acts complained of herein by the State transpired while the Act of 1899 was in force.

In the Missouri act of March 19, 1907 (Laws 1907, p. 377) which was in effect when the case at bar was brought, the first five sections thereof (now sections 10298, 10299, 10300, 10301 and 10302) are likewise, regard being had to different conditions and jurisdiction, *in pari materia* with sections 1, 2, and 3 of the

Sherman Act, in that, these sections, respectively, define the offenses and prescribe criminal penalties therefor. · Pursuing the comparison farther we find the procedure in civil cases prescribed respectively in the two acts, as follows:

Sherman Act, Sec. 4: "The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violations shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

Sec. 10303, R. S. 1909: "The several circuit courts of this State are hereby invested with jurisdiction to prevent and restrain any person or persons, corporation, partnership, individual or association of individuals from entering into any combinations, pools, agreements in the form of trusts, confederation, conspiracy or understanding declared illegal by this article, or any other law of this State relative to pools, trusts, conspiracies and unlawful combinations. And it shall be the duty of the Attorney-General and of the prosecuting attorneys to institute proceedings in equity to prevent and restrain all violations of this article and of any other law concerning pools, trusts and conspiracies and unlawful combinations. Such proceedings may be by way of petition, setting forth the case and praying that such violation be enjoined or o t h e r w i s e prohibited.

When the parties complained of shall have been duly notified of·such petition, the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition, and before final decree, the court may, at any time, make such temporary restraining order or prohibition as shall be just in the premises.''

Section 5 of the Sherman Act, which is as follows: ''Whenever it shall appear to the court before which any proceeding under section four of this act may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in this district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof,'' was until the amendment of our act by the said Act of 1907, also in our statute in almost the precise words of the Sherman Act above quoted. [See Sec. 8980, R. S. 1899.] For some reason,· this section was omitted from the Act of 1907, but whether it has, or has not been repealed, we need not now discuss.

Section 10304, Revised Statutes 1909, the penalties of which are being invoked in the instant case, is clearly not a statute prescribing procedure, but a statute prescribing the punishment which may be inflicted upon a guilty domestic, or domiciled foreign, corporation. Also section 10302, Revised Statutes 1909, prescribes the punishment which· shall be inflicted upon a natural person, found guilty of the felony therein denounced when prosecuted criminally. Can anything be clearer than that the penalties of

these two sections are not in the nature of things interchangeable? That a natural person cannot be punished under section 10304, nor can a corporation be punished under section 10302? There must be a common ground, otherwise a natural person or persons, or a co-partnership, might conspire with a corporation or many corporations and being legally incapable of common punishment, one or the other, or both, would go acquit. Suppose that in the instant case John Doe and Richard Roe, being sole traders in buying and selling yellow pine, and John Smith, being a manufacturer of yellow pine, had conspired and combined with the Arkansas Lumber Company and all of the other respondents, would the prosecution here have been in *quo warranto* against both corporations and persons, or an information for a felony against both the corporation and natural persons, or would the State have proceeded against the corporations in *quo warranto* and the natural persons by indictment as for a felony, for the identical offense, or would the State have pursued the one and let the other go acquit? [2 Eddy on Combinations, sec. 1085.] Can it be contended that *quo warranto* is a proper remedy in such case against a natural person? We submit so much *arguendo,* and touching neither question give an opinion. The points are not in the case. They are logs heaved overboard to ascertain if we have been drifting, and if so whither and how far.

With so much similarity in substance between our statutes and the Federal Sherman Act, our actions in this State have been uniformly by so-called informations in the nature of *quo warranto* brought in the Supreme Court and not in any circuit court, while the actions brought by the United States under the Sherman Act have been both by criminal prosecution (United States v. Patterson, 205 Fed. 292), and by action in equity in the circuit courts (now by amend-

ment of procedure, the district courts), of the United States. [United States v. Knight Co., 156 U. S. 1; United States v. Freight Association, 166 U. S. 290; United States v. Joint Traffic Assn., 171 U. S. 505; Hopkins v. United States, 171 U. S. 578; Anderson v. United States, 171 U. S. 604.; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211; Northern Securities Co. v. United States, 193 U. S. 1. c. 317.]

Clearly then an action in equity may be brought under section 10303 of our statute to "prevent and restrain" violations of these statutes against "pools, trusts and conspiracies." Such an action in a proper case would reach combinations *of* natural persons, *or* partnerships, or corporations, as well as natural persons *and* corporations. [Hopkins v. United States, supra; Anderson v. United States, supra.] No reason can be seen why the penalties provided for in section 10304 could not be made to follow a finding of guilt against a corporation pursuant to the procedure set out in section 10302. But this point is not before us. No theory is known under which a natural person violating these anti-trust statutes could be proceeded against by *quo warranto*. We have had a statute defining the practice in *quo warranto* and the conditions to which the same apply, since at least as early as January 14, 1825; this statute has survived the Practice Act and has come down to us almost unchanged. [Secs. 2631 et seq., R. S. 1909.] It is ample to oust from office any individual who usurps such office or any franchise and such was its ancient and time-honored office, but does a natural person violating these statutes usurp an office or a franchise? What does he usurp? Merely the right to break the law. He is a plain malefactor, an ordinary felon, liable to be incarcerated in the penitentiary for the violation of a penal statute. But this point is not in the case at bar. We mention it *arguendo*.

But the right to proceed against corporations for conspiracies in restraint of trade, is said by MARSHALL, J., to be derived from the common law. [State ex inf. v. Armour Packing Co., 173 Mo. 1. c. 388.] And the common-law method was by an information in the nature of *quo warranto*. [27 Cyc. 907.] "If," says Cyc. "a corporation is shown to be engaged in monopolizing an industry, *quo warranto* or similar proceedings may be begun by the Attorney-General or other proper officer and judgment may be rendered either dissolving the corporation altogether or ousting it from its present course." This is the rule abundantly settled by the holdings in this State. [State ex inf. v. Standard Oil Co., supra; State ex inf. v. Delmar Jockey Club, 200 Mo. 1. c. 70.]

It would appear then that we have in this State three methods of proceeding against violators of our anti-trust statutes: (a) by indictment or information as for a felony (if the offender be a natural person); (b) by bill in equity to "prevent and restrain, under section 10303, which, jurisdiction attaching, and proof being made, draws to it the punishments prescribed by section 10304; and (c) actions at common law by informations in the nature of *quo warranto*, where all defendants are corporations. If we could proceed against and convict for these offenses a natural person by a proceeding in *quo warranto*, we could not punish him.

It is fairly clear that in providing statutory remedies our Legislature did not contemplate that the remedies so provided would be utterly ignored and the old remedy at common law would be exclusively invoked in a court now sadly in arrears with its work and that the forum provided by statute would never be used. Be this as may be, the existence and nature of the three remedies provided and the nature and history and derivation of our statute, incline us to the view that the Legislature did not contemplate the use of a

jury in the equity proceeding, and that in the *quo war-ranto* proceeding our holdings in this State on this point have decided it, unless and until we shall see fit to overrule these cases. [State ex inf. v. Standard Oil Co., supra; State ex rel. v. Vail, supra; State ex rel. v. Lupton, supra.] We have also pointed out the similarity between the Sherman Act and our statute in order to point the moral, that since the Sherman Act has been said to be penal in its nature, so far as the necessity of strict construction is concerned (Northern Securities Co. v. United States, 193 U. S. l. c. 358), no reason can be seen why our statute, an exact rescript as to many sections and *in pari materia* as to all others here concerning us, is not also penal. [State ex inf. v. Continental Tobacco Co., 177 Mo. l. c. 37.] There is neither rhyme nor reason in an argument then, which urges upon us that since the Statute of Limitations may not run against the State in the ordinary *quo warranto* proceeding to determine title to office, or to determine the right of a town to assume corporate powers, therefore a proceeding under our anti-trust statutes follows the same rule, regardless of the fact that these statutes are penal. Whether there is a bar by limitation to the ancient office of an information in the nature of *quo warranto* or not, we need not decide, and so give no opinion, but since our statute is penal and since the penalty is death to the corporation, or confiscation of its property in whole or in part (by a fine) to the State, it is impossible to escape the conviction that section 1890 of our statutes prescribing limitations applies when aided by section 1914, both of which we quote supra, at length.

Such limitation, however, does not have reference to the day of the making and entering into the illegal conspiracy, but to the date of the last proven overt act under such conspiracy, regardless of the date at which the original illegal agreement was made.

[Ware v. United States, 154 Fed. 577; United States v. Brace, 149 Fed. 874.]

The sections quoted from the criminal law and providing for limitations for the bringing of actions for penalties and forfeitures, as urged by respondents, do not apply, for the very clear reason that this, as we have seen above, is a civil action and not a criminal action; therefore, the Statute of Limitations providing for the time within which civil actions must be brought must govern and guide us. Other jurisdictions also hold likewise. [Com. v. Birchett, 2 Va. Cas. 51.] We, therefore, hold, that all acts alleged to have been done in contravention of the statutes relating to pools, trusts and combinations by respondents prior to July 30, 1905, are barred, and that if we are to find them guilty we must so find them from unlawful conspiracies made and had subsequent to said date, or continuations of, or overt acts under, prior conspiracies, which continuations, or overt acts were done subsequent to the latter date.

This view obviates the consideration of the contention that the motion to elect should have been sustained.

V. It is urged by some of the respondents that we have no jurisdiction in this case because the acts alleged to have been done in contravention of law are the same acts over which the Interstate Commerce Law applies, and which acts are reserved by the Congress for its regulation.

This contention is no longer an open question and cannot be sustained. It was raised and disposed of in a manner opposed to the contentions of respondents in the case of State ex inf. v. Standard Oil Co., 218 Mo. l. c. 375. It was again urged in the United States Supreme Court on appeal in the latter case and was by that court decided against the contentions of respondent. These views, coming to us as they do, from

a well-considered case in this court, and with the approval of the views therein expressed by the highest court in the land, we do not feel disposed to re-open the discussion upon the point or to interfere with the conclusions reached in these cases, and resolve this point against the contention of respondents.

VI.   Learned counsel for some of the respondents urge that sections 10310, 10312 and 10304, Revised Statutes 1909, are unconstitutional.  They do not furnish us with any suggestions or reasons for the faith that is in them.  It is true, as we find, that by a somewhat ridiculous error, probably due to error of a clerk or copyist, the recital of the article and sections amended, is erroneous (Laws 1907, p. 377; Laws 1907, p. 374); but we see that if we strike out the erroneous part, which is incorrectly stated, as surplusage, a good, sufficient and correct title of the subject-matter and contents of the acts remains.  Besides, the acts refer to the title of the chapter by the style under which it has been known for years, that is, "Pools, Trusts and Conspiracies."  The articles and sections only have been interchanged, or swapped about, leaving the wording of the title of the acts in all other respects correctly expressive of the contents thereof.  We have no particular difficulty with this sort of clerical error, when we bear in mind the reason for section 28 of article 4 of our Constitution.  This court has expressed both the reason and the rule in this language:

"The evident object of the provision of the organic law relative to the title of an act was to have the title like a guide board, indicate the general contents of the bill, and contain one general subject which might be expressed in a few or a greater number of words.  If those words only constitute one general subject; if they do not mislead as to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title and does not im-

pinge on constitutional prohibitions." [St. Louis v. Weitzel, 130 Mo. 1. c. 616; State ex rel. v. Wiethaupt, 231 Mo. 1. c. 459.]

Judged by this rule, regard being had to the reason and wisdom of it, we would not say that so palpable an error, so patently corrected violates the amending act of March 19, 1907, even if this court had not in a more flagrant case, on all-fours with the facts here, held to the contrary. [State ex rel. v. Weithaupt, 231 Mo. 1. c. 460.] While the court held the act under discussion in the above case unconstitutional, it was not so held on this point, but upon another and different question entirely. Upon the identical point here to the fore the court-upheld the doctrine we here adhere to. Whether the combined effect of the two acts passed by the General Assembly in 1907, and which sought to repeal sections 8965 to 8982, Revised Statutes 1899, was sufficient for that purpose under the facts, we need not inquire, till a prosecution be brought under one of said sections attempted to be repealed by the act in question. We are unable to agree with this contention and disallow this point.

VII. Returning now to a consideration of the question which comes back to us upon the whole record, as to whether the facts shown in evidence (which facts and acts of the respondents or overt continuations thereof, under unlawful conspiracies in restraint of trade theretofore entered into, occurred on or subsequent to the 30th day of July, 1905), are sufficient to show that respondents are guilty as charged, we are led to a short resume of the facts in the record and to a consideration of the persuasive findings in this behalf by our commissioner.

The commissioner in his findings of fact upon which he bottoms his findings of guilt, bases the same upon three chief propositions: (a) The fixing of prices to be charged for yellow-pine lumber; (b) cur-

tailment of output by agreement and concerted movement; (c) open alliance with the Southwestern Lumbermen's Association, with the Lumber Secretary's Bureau of Information, and with the National Lumber Manufacturers' Association, all three of which associations he finds to be unlawful fosterers of criminal conspiracies, by which alliance respondents either themselves (1) divided territory among retail dealers, (2) agreed not to sell to so-called "poachers," farmers' co-operative yards, and consumers, or (3) agreed to sell only to so-called legitimate retail dealers, who were members of or under the protection of the said Southwestern Association, or consorted with knowledge of the fact, with those who did these things.

Clearly, if we find respondents not guilty of each and all three of these charges, including the triangular ramifications of charge (c), touching all of which there was proof adduced, the finding and judgment should be for respondents. If we find them guilty of any one of these charges, judgment should be against them.

Some preliminary observations upon cold questions of fact may be here referred to, so that they may be carried in mind through the discussion as to liability or not of respondents upon the facts.

The association was, as we have seen, organized in 1890; it had when this suit was instituted some three hundred members, who controlled at least one-third of the output of yellow-pine lumber in the United States. When this action began and for many years before, the association was annually expending in the conduct of its affairs from $60,000 to $75,000 per year, out of which sum the secretary was paid an annual salary of $8000, and of which sum one respondent alone paid $2500 per year, although until 1906—sixteen years after its organization—it had no word in constitution or by-law publicly setting forth and declaring the objects of its organization and maintenance, the *raisons*

*d'etre,* of its living, moving and having its being. At the meeting held in Memphis on the 27th of February, 1906, there were present some six attorneys, who, after viewing the transactions of the association, recommended that an amendment to the constitution be had, which should set forth to the public the association's excuse for existing. Accordingly in July, 1906, at the semi-annual meeting in Chicago, article 3 to the constitution was adopted. This article is as follows:

"The object of this association shall be to secure a full understanding of the conditions surrounding the lumber market in the territory covered by this association; the establishment of uniform grades for the inspection of lumber; to promote uniform customs and usages among manufacturers of lumber; to procure and furnish to its members such information as may tend to protect them against unbusinesslike methods of those with whom they deal, and such other information as may be for the benefit of the members of the association; and to propose and carry out such other measures as may be deemed for the welfare and in the interests of the manufacturers of lumber, who shall be members of this association."

Unfortunately for a clear and connected showing of the dealings of the Southern Lumber Manufacturers' Association and the Yellow Pine Lumber Association, the secretary had destroyed "as junk" in 1906, all of its records, including letters in letter files, up, apparently, to the very date of destruction. Likewise, some of the witnesses, practically all of whom were unfriendly, were afflicted with poor memories of only fairly ancient facts. As illustrating this difficulty, the below excerpt from the examination of a witness in the case is pertinent:

"Q. You have been a member of the Committee on Values for a number of years in the association? A. I think so.

"Q.  Will you tell the commissioner what years you acted as a member of the Committee on Values? A. I do not remember.

"Q.  Were you not a member of the Committee on Values during the years 1904 and 1905? A. I do not remember.

"Q.  Were you a member of the Committee on Values during the years 1902 and 1903? A. I do not remember that either. If you have got the records of the meeting, perhaps that may tell you. I know I was a member some time. The years I was a member I do not remember.

"Q.  Do you remember serving as one of the Committee on Values during the World's Fair year in 1904? A. Well, I do not remember.

"Q.  Well, you remember attending the so-called curtailment meeting at the World's Fair in 1904? A. No, sir; I do not think I did.

"Q.  The records show you were present at that meeting. Now, having called your attention to that fact, do you remember whether you were present at that meeting or not? A. Well, if you show me the record I might be able to tell. It is quite possible that if I could read the proceedings of the meeting over, something would refresh my memory so that I could recall. Well, I see here my picture in the proceedings. The chances are that I was there. I think you might take it for granted that I was. I see my picture, and I remember something now of standing out in front of the Hoo-Hoo building—I have that recollection.

"Q.  Now, you remember at that meeting—you remember you went into executive session and discussed the subject of curtailment? A. No sir; I do not.

"Q.  Do you not remember that such a session was held, at which time you were present and at which you discussed the subject of curtailment and there urged the agreement that thirty-three and one-third

per cent of the output of your lumber should be curtailed for the next ninety days? A. I should think that as president of the Chicago Lumber & Coal Company I would not represent them on the subject of curtailment, as I was not a manufacturer.

"Q. Now, independently of the Chicago Lumber & Coal Company, tell the commissioner whether you were present at that meeting and took part in the curtailment meeting? A. I do not remember of any executive session. I remember there was a meeting held in the large room. I do not think we adjourned to any other place to hold an executive session. I think the public or the people who were there present attending the meeting were all there at that time.

"Q. The record of the proceedings being called to your attention, state if· you went into executive session on the motion of Mr. N: W. McLeod. Do you remember such a motion being made? A. No, sir.

"Q. Do you remember the subject of curtailment being discussed there? A. Yes, sir; I think I do.  .  .  .

"Q. Tell the commissioner whether you took any part in the discussion of the curtailment at that time? A. I do not recall.

"Q. Do you remember Mr. J. B. White being there? A. No, sir; I do not think I do.

"Q. Do you remember Mr. R. A. Long being there? A. I think I do.

"Q. Do you remember his address at that time pointing out the surplus production of lumber? A. No, sir; I do not.

"Q. When did you first hear about the curtailment meeting held on that occasion? A. I presume if I was there I heard of it at that time.

"Q. What is your answer now to the commissioner as to whether you took part in that curtailment meeting or not? A. The minutes of the meeting show that I was there, but I have no recollection of it.

"Q. Do you remember being present at the meeting when it went into executive session? Do you remember what any member said about the curtailment there? A. No, sir.

"Q. Do you remember what Mr. R. A. Long said at that time in the executive session? A. No, sir.

"Q. Did you make a speech on the subject of curtailment? A. Not that I have any recollection of.

"Q. Did Mr. Nelson W. McLeod make a speech on the subject of curtailment? A. Not that I recall.

"Q. Did Mr. Charles A. Keith make a speech on it? A. Not that I recall.

"Q. Do you remember a single word that was said on the subject of curtailment? A. Not that I recall.

"Q. Do you remember that they had the subject of curtailment up? A. You mean in the meeting that they had the subject of curtailment up?

"Q. Yes, sir? A. I believe they did.

"Q. The records show you went into an executive session to discuss curtailment. Do you remember that? A. No, sir.

"Q. Did your Bradley Lumber Company curtail for ninety days? A. I do not recall that, either.

"Q. Did your Bradley Lumber Company curtail for six months? A. I do not recall that. I do not think they did.

"Q. What makes you have that opinion that you do not think they did? A. Well, that is a sawmill. It was not producing much at that time. I do not recall whether we curtailed or not.

"Q. Did you ever report to Mr. George K. Smith that you were curtailing at the Bradley Lumber Company? A. Not that I recollect of.

"Q. Did you ever receive a letter from Mr. George K. Smith, asking if you were curtailing, after that meeting? A. Not that I recollect of.

"Q. Do you remember any member of that association discussing with you the subject of curtailment at any time during the year 1904? A. It is possible they may have—if the matter was discussed. I have no recollection of it.

"Q. Did you go to the New Orleans meeting in January, 1905? A. I think not.

"Q. Do you remember attending the semi-annual meeting of the Southern Lumber Manufacturers' Association held in the city of St. Louis on July 18 and 19, 1905? A. I do not recall. If it was held here it is probable that I did attend.

"Q. Well, the record shows you were there, representing the Chicago Lumber & Coal Company—the official record of the association. Now, after having your attention called to that fact, what is your best recollection as to whether you attended that semi-annual meeting or not? A. I have no recollection of it at all. . . .

"Q. Ordinarily, you have a right good memory, have you not? A. Sometimes, on some subjects."

When this action was begun, our statute, which is leveled against "pools, trusts and conspiracies," in "restraint of trade," provided among other things that it was unlawful to (a) "create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any other person or persons to regulate, control or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience or repair," or to "enter into, become a member of or participate in any pool, trust, agreement, contract, combination, confederation or understanding to fix or limit the amount or quantity of any article of manufacture, . . . merchandise, commodity." [Laws of 1907, p. 377; Sec. 8965, R. S. 1899; Sec. 10299, R. S. 1909.] The petition in this case charges among other things and variations of this charge that "respondents

have created, entered into, become members of and participated in a pool, trust, agreement, combination, confederation and understanding among themselves, with each other and with other corporations and persons to relator unknown, with the purpose, design and view to regulate, control and fix the price to be paid by retail dealers in lumber and consumers of lumber in this State for lumber offered for sale and sold in this State, to maintain such prices when so regulated and fixed, to regulate, fix and limit the amount and quantity of lumber manufactured and bought and sold, to control and limit the trade in lumber, and to limit competition in such lumber trade in the State of Missouri.'' The petition charges consummation of these several acts, i. e., not only that respondents had conspired together with the ''purpose, design, view'' and intent to fix the price and limit the output of lumber in this State, but that they had, pursuant to this fell purpose, actually accomplished their designs and had fixed the price of lumber to consumers and retailers, and had limited the output of yellow-pine lumber in this State.

If from the proof we shall find that the respondents conspired with each other to limit the output, or amount of lumber manufactured in this State, clearly it makes no difference (except as affording an overt act, or continuance of the conspiracy, so as to toll the statute, if the original conspiracy itself has been barred by limitations) whether the agreement was ever carried out or not. Our statute is leveled against the making and entering into the conspiracy denounced; nor does it make any difference that some of the respondents have no mills in Missouri and actually manufacture no lumber here, so long as some of them do have mills here and do manufacture lumber here in this State, and so long as they have agreed, or conspired with local manufacturing respondents to cur-

tail the output or any part of the output actually made in Missouri.

The facts, as we have detailed them in the statement of the case under the catch-word "curtailment," show a most bold and flagrant agreement of the association of which respondents are, were or subsequently became members, to control and limit the amount of yellow-pine lumber manufactured in this State and elsewhere. This agreement was made June 14, 1904. The official report of the secretary of the Southern Lumber Manufacturers' Association (later the Yellow Pine Manufacturers' Association, and which for convenience we will style the Yellow Pine Association), uses this language:

"The meeting then went into executive session to deal with the question of curtailment of output as referred to in the president's address and the secretary's report. The matter received very careful consideration, and from the figures submitted it was found advisable to recommend to all manufacturers a reduction of thirty-three and one-third per cent of the output of all sawmills until such time as the demand should more nearly absorb the supply."

Present at this meeting by their representatives and actually participating, so far as the record shows, were the following respondents: Arkansas Lumber Company, Bowman-Hicks Lumber Company, Central Coal & Coke Company, Chicago Lumber & Coal Company, Colonial Lumber & Timber Company, Dierkes Lumber & Coal Company, Foster Lumber Company, Freeman-Smith Lumber Company, Grayson-McLeod Lumber Company, Long-Bell Lumber Company, Missouri Lumber & Land Exchange Company, Missouri Lumber & Mining Company, W. R. Pickering Lumber Company, and Van Cleve Lumber Company.

Subsequently and at the next annual meeting of the Yellow Pine Association held at New Orleans January 24, 1905, Mr. R. A. Long, the then president of

the said association, delivered an address, in which he said, relative to the curtailment movement, among other things, this:

"This condition caused a break in our prices to such an extent that by June first we found the manufacturers sufficiently anxious to sell and the retailer and the consumer so disinclined to buy, as to bring our selling price close to and in some cases below the cost of manufacture, and so, at our semi-annual meeting in June, a resolution was passed looking to the reduction of our output about thirty-three per cent. Some of the most successful men in our line of business shook their heads and made the statement that we could not 'legislate prices,' that supply and demand must govern, and that the supply would be governed by 'survival of the fittest.' In spite of these prophecies we succeeded in securing the co-operation of about eighty per cent of the manufacturers of yellow pine, and so the plan was entered into and tested between July first and October first. In less than ten days from July first the downward tendency of prices had been checked, and within thirty days a substantial advance had been made."

A difference of verbiage, perhaps owing to loose diction, will be noted, as occurring in the language of the secretary and the president. The president speaks of the curtailment movement as having been originated by a "resolution" of the Yellow Pine Association, while the secretary in his report calls it a "recommendation." This speech of the president, after being characterized by the movent as a "wonderful address," was referred to a committee for such action as the committee might deem proper to make touching the recommendations contained therein. The committee made, touching the phase of curtailment, this report:

"Your committee, to whom was referred the address of our president, respectfully report:

"We recommend to all members a most careful study of all the suggestions so ably presented. Recognizing the great victory gained by our late efforts at curtailment, we offer the following:

"Resolved, That there shall be appointed a permanent Committee on Values.

"In addition to former work of said committee, it shall be their further duty to appoint, from their own number, a select committee of five, who shall be charged with carefully studying all market conditions and conditions of stock, and who shall, in event of apparent necessity, take such action to secure further curtailment as they may deem needful."

This report was, on January 25, 1905, adopted, as the official report of the Yellow Pine Association shows. Present at the adoption of this resolution and apparently participating therein, were representatives of the following additional respondents: Alf Bennett Lumber Company, Geo. W. Miles Timber & Lumber Company, Louis Werner Sawmill Company. Present at both the 1904 and the 1905 meeting were representatives of the Frost-Trigg Lumber Company, Barr-Dubach Lumber Company, and Fred B. Dubach Lumber Company, but since, as to the three latter this action has been already dismissed by the State, on account of inability to obtain jurisdiction over them, we need not longer consider them.

The sixteen respondents first and secondly above mentioned actually participated in the original agreement to curtail the output of yellow-pine lumber. While all these things occurred more than three years before this action was begun, and while, as we have seen, the original unlawful agreement to limit output was entered into on June 14, 1904, yet we find the sixteen named respondents either participating in renewals of it, glorying in the results of it and passing resolutions to continue it indefinitely in January, 1905, or actually

present and taking active part in the making of it. Conceding that we must, in order to toll the statute, find the commission of an overt act within the three-year period, if the original conspiracy be barred, we may yet find this by circumstantial evidence. [State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1.] But we are not under the facts here compelled to resort to circumstantial evidence. We have the admissions of the chief officer and only active managing officer, namely the secretary of the association. In his report to the annual meeting held in January, 1908, Secretary Smith among other things, says:

"In closing my report one year ago this sentence was used: 'Unless something unforeseen happens to prevent, we should move forward during 1907 with increasing numbers and increased benefits to every member.' As you all know, 'something' happened late in October, which put the brakes on suddenly, and the effect will be noted in our figures on production, as well as in the growth of the association and the income account.

"Many will remember a circular issued on October 3rd calling attention to condition of stocks at that time which should cause manufacturers to 'stop, look and listen.' Since that time, owing to the financial stringency, there has been a marked reduction in production.

"At a mass meeting of manufacturers of yellow pine, held in Memphis on November 14th, a suggestion was made that the running time of sawmills be secured, with a statement as to any increase or decrease in production. From actual reports sent in, the reduction in production during November among 328 mills was 203 million feet; among 420 mills in December 309 million feet, and among 206 mills in January will be 273 million feet. Using these figures as a basis, it is reasonable to count on a reduction in output between November 1, 1907, and January 31, 1908, of one billion

feet, or forty-four per cent, in the States covered by our membership. The effect on stocks will be shown later. Calls for running time of sawmills will be made monthly until conditions change.''

Members of the Yellow Pine Association are not so far co-partners as that the unlawful agreements or conspiracies of certain, or a majority of the members, will bind those not actually making or present and participating in the making of such agreement, unless being members, but having no active part in the making of the agreement they, yet carry out such agreement by an overt act done in accordance therewith. In the case of State ex rel. v. Stock Exchange, 211 Mo. l. c. 191, all members of the association conspired, but only a part of the members acted. Here in the case at bar no overt general rule, resolution or by-law of the Yellow Pine Association expressed any unlawful purpose or tendency, and only part of the respondents were present at the meeting which passed, or at the endorsement of, the curtailment resolution; hence the distinction. [State ex rel. v. Stock Exchange, 211 Mo. 181.] Since some of the acts and purposes of the Yellow Pine Association were praiseworthy, the merely becoming a member of it was not of itself so far a conspiracy as to cause an invocation of the rule that, a conspiracy being shown, the acts and statements of any conspirator, *dum fervet opus*, will bind all. Yet if one know of an unlawful conspiracy of an association and of its unlawful acts, and so having knowledge join it, such one becomes tainted with like guilt as inheres to him who took part in the conspiracy at its inception. [United States v. Lake Shore & M. S. Ry., 203 Fed. 295.] But a member of this association is not to be held guilty and is not bound by the admissions of a co-member of the association, if, having taken no part, he withdraw on getting knowledge, or if, without knowledge of the association's conspiracy, he subsequently join, but take no part in the conspiracy, or

being a member of the association at the time the conspiracy is made, neither be present at the making thereof, nor have knowledge of it, nor take part in it, nor knowingly take profit from it.

In passing this point and in a way apropos thereto, we note that learned counsel for respondents complain strenuously, if not bitterly, that the commissioner refused to declare as a matter of law that "the objects and purposes of the Yellow Pine Association as expressed in its constitution and by-laws as they have existed since the month of January, 1902, are in all respects legal and laudable." In the view we take of the law and which we have expressed herein, the refusal of the commissioner to so declare cuts no figure in the case. In the view we take of the facts this is also for a greater reason true. For if the record shows any one point conclusively and beyond dispute, it is that neither the Yellow Pine Association nor its predecessor ever had a by-law or a section in its constitution setting forth its objects, or reasons for existing, till July, 1906. This too, notwithstanding it had expended in its maintenance more than $225,000 in all; that it paid its secretary for many years an annual stipend of $8000, and spent annually for up-keep from $60,000 to $70,000, and had been in existence for sixteen long years! Having no publicly expressed objects how could its purposes be divined, except by its overt acts? "Wherefore by their fruits ye shall know them." [Matthew, 7:20.]

Coming back to the legal effect, under our statute, of the "curtailment" or limitation of output of lumber growing out of the acts of the Yellow Pine Association, as the statement, eked out by this opinion, shows them, there can be but one view we take it that such acts were unlawful and fall within the purview of the acts denounced by our law. [State ex rel. v. People's Ice Co., 246 Mo. 168; State ex rel. v. Fireman's Fund Ins. Co., supra.]

This brings us to a consideration of the proof upon the charge that respondents fixed the prices to be charged for yellow-pine lumber in this State. The learned commissioner finds that respondents are guilty also upon this charge. Practically from the organization of the association of yellow-pine-lumber manufacturers and dealers, this association issued a price list. We need not go back in the discussion here further than the year 1902, however. At each annual meeting there was appointed by the Yellow Pine Association a committee of members thereof, consisting of from ten to fifteen of the largest manufacturers and most prominent and aggressive members of the association. The record shows that R. A. Long of the Long-Bell Lumber & Coal Company; S. H. Fullerton, of the Chicago Lumber & Coal Company; C. S. Keith of the Central Coal & Coke Company; N. W. McLeod of the Grayson-McLeod Lumber Company, and J. B. White of the Missouri Lumber & Mining Exchange Company, were usually found serving upon this committee, which was called interchangeably the "Committee on Values" and again the "Committee on Price List." The persons named above were, when this suit was begun, and for years had been, president or managing officers of the respective respondents whose names follow theirs above herein. We deal in no fulsome praise and render honor only where honor is due when we say that in the affairs of the Yellow Pine Association throughout its career, these five persons were *facile princeps,* in "bad eminence."

This Committee on Values was a standing committee, which made report at the annual and semi-annual meetings of the association, recommending given and stated prices for each item of the several grades and specifications of lumber manufactured and sold by the component members of the association. These reports of the Committee on Values were adopted by the association as the prices to be charged for the

several items and grades of lumber. The Committee on Values also, if need arose, met in the interim between the annual and the semi-annual meetings of the association and promulgated new price lists of yellow-pine lumber, which lists the committee transmitted to the secretary and the latter sent out to the members of the association. In the year 1905 seven such price-lists were gotten out. These conditions subsisted till sometime in the latter part of the year 1905 or the early part of the year 1906, when legal investigations of the methods of the association, or of certain of its component members, having been set on foot in the State of Mississippi, the Yellow Pine Association, through its board of directors, unanimously adopted a resolution on the 24th day of January, 1906, providing that the Committee on Values should no longer make any report other "than of existing conditions applicable to the trade," and that such committee should not make "*any recommendation affecting prices to be charged for lumber or the amount of the product or output thereof.*" This resolution, as well as the reasons for the adoption of the same, are set out *in extenso* in the statement of the case. No report of the Committee on Values was presented to the following annual meeting. But at the next meeting of the board of directors a new section was added to the by-laws of the association. This section was adopted February 27, 1906, and is as follows:

"Section 5. A committee of thirty shall be appointed by the president, to be known as the 'Market Committee,' whose sole duty it shall be to ascertain from time to time and in such manner as they may deem advisable, the prevailing market price of the various classes of yellow-pine lumber and the existing conditions as to supply and demand for the same, and to cause the facts thus ascertained to be disseminated from time to time among the members of the associa-

tion; and it shall be the duty of the secretary to aid said committee in the discharge of its duty."

The committee of thirty was appointed. The names on it are familiar names upon the record. By the advice of counsel they never acted, but later the matter of getting out a price-list of lumber, or a "Yellow Pine Price Current," was turned over to George K. Smith, the secretary of the Yellow Pine Association, who selected a list of sixty-three correspondents, for the major part members of the association, from whom he got monthly reports of the prices which they were asking for lumber of the several kinds, grades and specifications adopted by the association. From these reports, he says, as a basis he made up a flat rate sheet of delivered prices upon a basis of a freight rate of twenty-three cents per hundredweight. We need not here go into the details of the printing, dissemination and promulgation of this list. We have set these out in the statement. Suffice it to say that the prices shown by Secretary Smith's compilation of the reports of his sixty-three correspondents, were unfair; they are styled by the learned commissioner "boosting" prices. If a great majority of the sixty-three reports showed no advance in the price of a given item, the price list would yet, almost without a single exception, show an increase in the price of this item. From time to time flat-rate lists were made up; from these as a basis booklets were prepared, showing delivered prices on the various kinds and grades of yellow-pine lumber at freight rates from ten cents to forty-five cents. These booklets were issued by the association and so stated upon their title-pages, till as late, at least, as December 27, 1905. They were called "Yellow Pine Price Currents" till, at least, as late as July 18, 1906, and were afterwards styled "Market Reports on Yellow Pine Lumber." Till December 27, 1905, they bore a date, stating at what time the prices therein became effective, and this too, wheth-

er they were gotten out, or purported to be, by the individual members of the Yellow Pine Association or by the secretary of the association. Some nine to thirteen thousand of these lists were printed for each *revision* of prices and sent out by the secretary. Sometimes a special cover, as for the Long-Bell Lumber Company, would be used to enclose the flat list, or the booklets with the freight rates extended, in which case the members of the association, respondents and others, would give orders to the secretary for whatever number of copies of the flat-list or the booklet were desired. These would be fitted with the individual cover of the member, addressed upon the addressograph of the secretary of the association and by him sent out to retailers and customers of the members of the association. This, in brief, is a recapitulation of the acts of the association upon the charge under discussion.

The learned commissioner finds that the members of the association, including the respondents, did not abide by the prices shown upon these price lists, either when the latter were made by the Committee on Values, or when made by the secretary. This, we think, is a correct finding.

But our statutes, recognizing as impossible and futile the legal tracing of the criminal act therein denounced from cause to effect, have wisely made the offense to consist in the entering into of the conspiracy to fix prices. Here we see the respondents actually fixed the prices, but they did not faithfully follow and abide by them. The reason for this and for the discrepancy seen in the prices actually charged for lumber as between the several respondents is not far to seek. The respondents were continually, as was natural, *long* on certain kinds, sizes and grades, and *short* on others; the first condition dominated a cutting below the list price as arbitrarily fixed by the Committee on Values or by the secretary as we have seen, and the

second a "boosting" above that list price. Again, advances of cash being made to small mill men, and the loans falling due, the resultant desire to collect resulted in the placing of the lumber manufactured by these small manufacturing non-members upon the market continually at a price below the list. But one fact is accentuated, that is that the price was constantly advancing. While a rigid adherence to the prices fixed was in the nature of things well-nigh impossible, yet the prices charged revolved about the prices fixed like planets in their orbits revolve about the sun.

We are not to be understood as declaring as a matter of law under our Missouri anti-trust statutes, that dealers or manufacturers of any vendible commodity of sale or manufacture may not issue a price-current. But such a list, or compilation of prices ought either to be compiled and promulgated by an indifferent or wholly disinterested person, or if compiled and promulgated by an interested person it ought to be honestly and fairly compiled; it ought fairly to represent current prices as based upon actual sales, or upon actual offers to buy and actual offers to sell, and not misrepresent such prices with a view of boosting any prices of any item or items. If in the instant case there had been touching this price-current matter no antecedent unlawful acts of the Yellow Pine Association; if this association had not for years promulgated as current prices, lists which falsely represented and arbitrarily fixed the price of yellow-pine lumber pursuant to the adopted report of a Committee on Values, and if Smith, the secretary of the association, pursuing the lawful methods originated by him of obtaining reports from correspondents of actual sales, had fairly compiled and averaged such reports into a list of current-prices of yellow-pine lumber, we would not say that Smith's acts, or the acts of the association in this behalf were unlawful. In truth the name "prices current" explains itself in law as in diction. To pur-

sue the matter further would be merely to define common honesty, the rules of which in the last analysis are all the respondents in this matter are by law required to follow.

That these prices were reasonable, as they contend, and such as in the nature of things might have eventuated regardless of the acts of respondents, does not help them; they may not violate the law and when caught red-handed say, as a defense, that their acts perhaps hurt no one, since the chances are the prices would have risen any way (Addyston Pipe & Steel Co. v. United States, 175 U. S. 1. c. 237); nor does it avail them to urge that the real object of the Yellow Pine Association was good, and that the ills which grew up in or grew with the association were unintentional. [State ex rel. v. Firemen's Fund Ins. Co., supra.] It is not necessary for an agreement which restrains trade to be entered into for the purpose of so doing; it is enough that the obvious and necessary effect of the agreement is to restrain trade. [United States v. Freight Association, 166 U. S. 290.]

Since we hold that this court is not concluded by the rulings of the learned commissioner in admitting or in excluding evidence, nor by his conclusions of law, but that we may from the evidence preserved in the record make our own findings of fact as well as our own conclusions of law, it follows that we need not concern ourselves with the exceptions taken by the respondents, nor need we pass upon any of the thousand or more objections and exceptions to the admission of testimony. If we find facts enough based upon competent and admissible evidence, and law enough in the record to sustain one or more of the charges made, this is all that is necessary in order to make proper a judgment of guilt against the respondents.

Indubitably, since the Yellow Pine Manufacturers' Association is not sued herein; since no allegations are made in the information regarding it, and

since no relief is asked as against it, we are without power in this action to give relief, except in so far as what is said herein may operate as rules of ethics by which it may square its behavior, or as a chart by which it may hereafter steer its course. The remedy afforded by section 10303 might have reached it, but that is not invoked (Hopkins v. United States, supra), and so the Yellow Pine Association is not before us in the legal flesh.

It follows that we find the following respondents guilty as charged of (a) conspiracy to limit the output or amount of yellow pine to be manufactured in Missouri; and (b) of fixing the prices to be charged in Missouri for such lumber, to-wit:

Alf Bennett Lumber Company,
Arkansas Lumber Company,
Bowman-Hicks Lumber Company,
Bradley Lumber Company,
Calcasieu Long Leaf Lumber Company,
Central Coal & Coke Company,
Chicago Lumber & Coal Company,
Colonial Lumber & Timber Company,
C. J. Carter Lumber Company,
The Dierkes Lumber & Coal Company,
Dixie Lumber Company,
Foster Lumber Company,
Freeman-Smith Lumber Company,
Geo. W. Miles Timber & Lumber Company,
Grayson-McLeod Lumber Company,
Hogg-Harris Lumber Company,
Leidigh-Havens Lumber Company,
Long-Bell Lumber Company,
Louis Werner Saw Mill Company,
Lufkin Land & Lumber Company,
Missouri Lumber & Land Exchange Company,
Missouri Lumber & Mining Company.
The Ozan Lumber Company,
W. R. Pickering Lumber Company,

Van Cleve Lumber Company.

We find the following respondents not guilty, to-wit: Detroit Timber & Lumber Company, for the reason that, though it was a member of the Yellow Pine Association from 1902 till some nebulous time in 1905, we are not able to say definitely from the proof whether it was a member on the 30th of July, 1905, or not; Ferguson-McDaris Lumber Company, for the reason that upon the face of things, upon the letter of its constitution and its by-laws, the Yellow Pine Association had reformed upon the surface when this respondent became a member thereof in 1907, and there is no sufficient proof in the record that this respondent had guilty knowledge of its past illegal acts (United States v. Lake Shore & M. S. Ry., supra); or knowledge of any illegal practices of the secretary in getting out the so-called market reports, since this respondent was a member for one year, the year 1907 only: Glen Lumber Company, which became a member in 1906, for the same reasons last above set out; Ingram Lumber Company, a member when suit was begun, for the reason that there is no proof as to when it became a member, no proof of actual participation in the making of any illegal agreement, or any proof of knowledge that such were made, or proof of any operations thereunder; and the Robert Kamm Lumber Company, which became a member of the Yellow Pine Association in 1907, but touching whose participation in, or guilty knowledge of, the illegal practices, there is no definite proof in the record.

From the facts as shown by the record; from the length of time of participation in the unlawful acts, and from the active and aggressive, or passive participation, as the case is, of respondents' officers and agents in these acts, we do not find that the ends of justice would be subserved by meting out to each of the guilty respondents the same punishment.

In our opinion judgments of forfeiture should be entered as to each of the below-named respondents, dissolving and ousting them from all and singular their corporate rights, privileges and franchises, and in addition thereto a fine in the sum below-named should be imposed against them respectively, as set following their names, as a punishment for their, and each of their, violations of the laws of this State, which sums shall be paid into the State Treasury for the use and benefit of the State of Missouri, within thirty days from the date of the rendition of this decision and of the judgment bottomed thereon, that is to say:

Alf Bennett Lumber Company, ouster and a fine of $1000.

Bowman-Hicks Lumber Company, ouster and a fine of $10,000.

Bradley Lumber Company, ouster and a fine of $50,000.

Calcasieu Long Leaf Lumber Company, ouster and a fine of $50,000.

Central Coal & Coke Company, ouster and a fine of $50,000.

Colonial Lumber & Timber Company, ouster and a fine of $10,000.

C. J. Carter Lumber Company, ouster and a fine of $5000.

Dixie Lumber Company, ouster and a fine of $5000.

Foster Lumber Company, ouster and a fine of $5000.

Geo. W. Miles Timber & Lumber Company, ouster and a fine of $1000.

Grayson-McLeod Lumber Company, ouster and a fine of $50,000.

Hogg-Harris Lumber Company, ouster and a fine of $500.

Leidigh-Havens Lumber Company, ouster and a fine of $5000.

Long-Bell Lumber Company, ouster and a fine of $50,000.

Louis Werner Saw Mill Company, ouster and a fine of $5000.

Lufkin Land & Lumber Company, ouster and a fine of $8000.

Missouri Land & Lumber Exchange Company, ouster and a fine of $6000.

Missouri Lumber & Mining Company, ouster and a fine of $50,000.

The Ozan Lumber Company, ouster and a fine of $5000.

Van Cleve Lumber Company, ouster and a fine of $5000.

Being of the opinion, however, that there are, as stated, diverse degrees of guilt among these respondents and that, upon the surface at least, the Yellow Pine Association has reformed some of the evils which it long openly and flagrantly practiced, we are further of opinion that the ends of justice will be subserved by granting a stay of execution pending the further order of this court of the decree of forfeiture and ouster as to some of these respondents upon the payment by them of the fines severally assessed against them within thirty days, and upon such conditions of continuing good behavior as may hereafter be annexed thereto by this court by its decretal order, that is to say, as to the following respondents: Alf Bennett Lumber Company; Colonial Lumber & Timber Company; C. J. Carter Lumber Company; Dixie Lumber Company; Foster Lumber. Company; Hogg-Harris Lumber Company; Leidigh-Havens Lumber Company; The Ozan Lumber Company; Van Cleve Lumber Company, and the Louis Werner Saw Mill Company.

We are further of the opinion that the licenses to do business in Missouri heretofore issued by the State of Missouri to the following named respondents, which are foreign corporations, should be revoked for vio-

lations of law as stated herein, usurpation and mis-user, that is to say: Arkansas Lumber Company; Chicago Lumber & Coal Company; the Dierkes Lumber & Coal Company, and Freeman-Smith Lumber Company, and that in addition to the cancellation and revocation of the licenses of the above-named respondents, they and each of them, as also W. R. Pickering Lumber Company, be fined for their violations of law aforesaid in the sums respectively below set out, which sums are respectively to be paid into the State Treasury for the use and benefit of the State of Missouri, within thirty days from the date of the rendition of this decision and the judgment bottomed hereon, that is to say:

Arkansas Lumber Company, revocation of license and a fine of $3000.

Chicago Lumber & Coal Company, revocation of license and a fine of $50,000.

The Dierkes Lumber & Coal Company, revocation of license and a fine of $5000.

Freeman-Smith Lumber Company, revocation of license and a fine of $1000.

W. R. Pickering Lumber Company, a fine of $1000.

But we are further of the opinion that for considerations heretofore expressed, and in order to make the punishment correspond with the respective degrees of guilt of the several respondents, a stay of execution of the decree of forfeiture and revocation of their licenses to do business in this State pending the further order of this court upon payment of the fines severally assessed against them, and upon conditions hereafter to be annexed thereto by the court by decretal order, should be entered and made as to the following named respondents, that is to say: Arkansas Lumber Company, The Dierkes Lumber & Coal Company, and the Freeman-Smith Lumber Company; all of which is so ordered.

*Lamm, C. J., Graves, Bond* and *Walker, JJ.,* concur; *Woodson, J.,* concurs in result, except as to so much of opinion as adjudges absolute ouster as to sundry respondents; *Brown, J.,* not sitting.

PER CURIAM.—Upon consideration all the pending motions in this case are disposed of by an order and judgment to be entered in the following form:

"Now at this time the joint and several motions by respondents to modify our judgment and to stay the issuance of our writ of ouster, and to reduce the fines fixed by our judgment in this cause, coming on to be heard, are by the court taken up, considered and disposed of as follows:

1st. All such motions and all parts of such motions as go to the modification of our judgment heretofore rendered, so far as such motions ask for a reduction of fines imposed, are overruled.

2nd. All such motions and parts of such motions in so far as they ask and pray for a suspension of our writ of ouster upon the judgment heretofore rendered are sustained to the following extent and upon the following conditions.

(A) The writ of ouster from corporate rights and franchises will be suspended as to all of the respondents, who within thirty days from this date shall have paid to the clerk of this court one-half of the fine or portion of the fine it is required to pay, and who within sixty days from date shall have paid the remaining one-half, and the costs of this proceeding, and who shall have, at the end of such sixty days complied with the following conditions: (1) that they have paid the fine and costs as above stated and (2) that such respondents show by competent evidence, by way of affidavits from its managing officers, the following things: (a) That such respondents or respondent has withdrawn from the Yellow Pine Manufacturers Association and from all associations of a like character; (b)

that such respondents or respondent have no officer,
agent, director, stockholder or employee which is a
member of such Yellow Pine Manufacturers Associa-
tion, or one of similar import or character; (c) that
such respondents or respondent will not in the future
become a member of such association or any similar
association or permit any officer, agent, director, stock-
holder or employee to become a member thereof; (d)
that such respondents or respondent will in the future
sell lumber in Missouri in open and honest competition
with all other wholesale dealers in lumber; (e) that
such respondents or respondent will not discriminate
between buyers of lumber and other material sold by
them, and will treat all purchasers alike, and such re-
spondents will not agree in any way to discriminate
against purchasers; (f) that such respondents or re-
spondent have and will discontinue the practice of
blacklisting any retail dealer who sells or undertakes
to sell within the territory of another retail dealer,
and to this end will discontinue the publication of any
credit report based upon the idea that any retail dealer
is one who has been selling in the territory of another
retail dealer; (g) that such respondents or respondent
will give no recognition to the demands of any organi-
zation of retail dealers, but will treat all retail dealers
alike in making sales to them, whether such purchaser
is a member of a retail dealers association or not;
(h) that such respondents or respondent will not be
a party to any agreement or understanding to con-
trol the amount of the production of lumber; (i) that
if any retail dealers' association, or one or more re-
tail dealers, undertake, with respondents or any re-
spondent, to inaugurate any system or systems by
which honest and real competition in the sale of lum-
ber, by retail or wholesale, in the State, is or will be
restricted, such respondent or respondents will
promptly lay all such facts before the Attorney-Gen-

eral of this State; (j) that such respondents or respondent will not be a party to the publication or circulation of any price current, except such a price current as gives actual and bona-fide sales of such products and the prices paid therefor, for the honest information of dealers therein; (k) that such respondents or respondent are not now engaged in, and will not in the future engage in any practice or practices which violate either the letter or spirit of the anti-trust laws of this State.

(B) As to the following respondents it is ordered that a stay of execution as to a part of the fine imposed by our judgment be granted.

(1) If the respondent Grayson-McLeod Lumber Company pay to the clerk of this court the sum of twenty thousand dollars—one-half in thirty days and one-half in sixty days—our execution for the remaining sum of $30,000 of the fine imposed will be stayed during the good behavior of such corporation, but in case such corporation further infract the laws of this State, or in anywise disobey the terms of the decrees entered in this case, then execution may issue, upon the application of the Attorney-General, or by the court of its own motion, for the said sum of $30,000 stayed as aforesaid, with interest thereon at the rate of eight per cent per annum from this date.

(2) If the respondent Calcasieu Long Leaf Lumber Company pay to the clerk of this court the sum of twenty-five thousand dollars—one-half in thirty days and one-half in sixty days—our execution for the remaining sum of $25,000 of the fines imposed will be stayed during the good behavior of such corporation, but in the event such corporation further infract the laws of this State, or in anywise disobey the terms of the decrees entered in this case, then execution may issue, upon the application of the Attorney-General, or by the court of its own motion, for the said sum of

$25,000, stayed as aforesaid, with interest thereon at the rate of eight per cent per annum from this date.

(3) If the respondent Central Coal & Coke Company pay to the clerk of this court the sum of thirty thousand dollars—one-half in thirty days and one-half in sixty days—our execution for the remaining sum of $20,000 of the fine imposed will be stayed during the good behavior of such corporation, but in the event such corporation further infract the laws of this State, or in anywise disobey the terms of the decrees entered in this case, then execution may issue upon the application of the Attorney-General, or by the court of its own motion, for the said sum of $20,000, stayed as aforesaid, with interest thereon at the rate of eight per cent per annum from this date.

(4) If the respondent Missouri Lumber & Land Exchange Company pay to the clerk of this court the sum of three thousand dollars—one-half in thirty days and one-half in sixty days—our execution for the remaining sum of $3000 of the fine imposed will be stayed during the good behavior of such corporation, but in the event such corporation further infract the laws of this State, or in anywise disobey the terms of the decree entered in this case, then execution may issue, upon the application of the Attorney-General, or by the court of its own motion, for the said sum of $3000, stayed as aforesaid, with interest thereon at the rate of eight per cent per annum from this date.

(C) When all of the conditions aforesaid have been complied with by the respondent or respondents, within the time aforesaid, to the satisfaction of this court, our writ of ouster will be stayed during the good behavior of such respondent, and in the case of a stay of execution as to a part of the fine, such stay of execution will be granted during the good behavior of such respondent, such stays of judgment as to absolute ouster and portion of fines, to be finally entered

after satisfactory proof has been made as herein required.

(D)  All motions to modify our conditional ouster as contained in the original judgment, so as to remove the same, and leave only a judgment for a fine, are overruled.

(E)  The court retains its full jurisdiction over the case and each of the respondents for the making of all necessary future orders.

To this disposition of such motions all concur, except *Woodson* and *Faris, JJ.,* who dissent; *Woodson, J.,* agrees to all that is done by the foregoing judgment and order, but is of opinion that a stay of execution as to one-half of the fines assessed against other defendants, not mentioned in this order, should be ordered. *Faris, J.,* adheres to the views expressed in his original opinion.—Filed July 2, 1914.